## LYNN A. RITTER, A MINOR, BY MABEL ENGEBRETSON, HER GENERAL GUARDIAN, AND OTHERS v. VILLAGE OF APPLETON.

93 N. W. (2d) 683.

December 5, 1958—Nos. 37,505, 37,506, 37,507, 37,508, 37,509.

*James R. Bennett, Mahoney & Mahoney,* and *Harry H. Peterson,* for appellant.

*Johanson, Winter & Lundquist,* for respondents Darus and Doyle Howard.

*Stahler & Giberson,* for respondents Ritter.

*Benson & Schreiner,* for respondent Marjorie Howard.

THOMAS GALLAGHER, JUSTICE.

Actions under the Civil Damage Act, M. S. A. 340.95,[1] by Mabel Engebretson as general guardian of Lynn A. Ritter and Mark S. Ritter, minors; and by Marjorie Howard on her own behalf and as general guardian of Darus Howard and Doyle Howard, minors, against the village of Appleton for loss of support[2] resulting from an automobile accident in which Steve Ritter and his wife Patricia Ritter, father and mother of Lynn A. Ritter and Mark S. Ritter, and Fred Howard, husband of Marjorie Howard and father of Darus Howard and Doyle Howard, all met death.

---

[1] M. S. A. 340.95. "Every husband, wife, child, parent, guardian, employer, or other person who is injured in person or property, or means of support, by any intoxicated person, or by the intoxication of any person, has a right of action, in his own name, against any person who, by illegally selling * * * intoxicating liquors, caused the intoxication of such person, for all damages, sustained; * * *."

[2] The personal action of Marjorie Howard was also for injuries and medical expenses incurred, but her recovery was limited to loss of support because of a settlement for injuries and medical expense made with her in her previous action.

The accident occurred on December 31, 1954, at about 8:30 p. m., on Highway No. 12, Shible Township, near the village of Appleton in Swift County, when an automobile driven by Henry M. Hanson collided with one driven by Fred Howard in which Marjorie Howard and Steve and Patricia Ritter were passengers. Hanson also met death in this accident. Plaintiffs submitted evidence to establish that, shortly before the accident, defendant village had sold intoxicating liquors to Hanson in violation of § 340.14, subd. 1,[3] causing or contributing to his intoxication and the resulting accident.

Prior to these proceedings actions against Henry M. Hanson under the Wrongful Death Act, § 573.02,[4] were instituted by Lloyd Hills as trustee on behalf of Marjorie Howard, widow, and Darus Howard and Doyle Howard, sons and heirs at law of Fred Howard, for loss of support. Marjorie Howard also instituted a separate action for personal injuries and medical expenses. Settlements therein were effected whereby $8,000 for loss of support was paid to said trustee for such heirs at law, and $8,000 was paid to Marjorie Howard for personal injuries and medical expenses. At that time, in consideration for such settlements, Lloyd Hills, as trustee of the heirs at law of Fred Howard, executed a release wherein he released and discharged Henry M. Hanson and his insurer from any and all claims and liability arising out of the injuries and death of Fred Howard, including any claims for loss of services his heirs at law and next of kin may have sustained by reason thereof.

Marjorie Howard executed a separate release in her actions wherein she released and discharged Henry M. Hanson, his successors, assigns, agents, and servants from any and all causes of action, claims, and

---

[3] § 340.14, subd. 1. "* * * No intoxicating liquor shall be sold or furnished for any purpose to any person * * * obviously intoxicated * * *."

[4] § 573.02, subd. 1. "When death is caused by the wrongful act or omission of any person * * * the trustee appointed as provided in subdivision 2 may maintain an action therefor * * *. The recovery in such action is such an amount as the jury deems fair and just in reference to the pecuniary loss resulting from such death, shall not exceed $25,000, and shall be for the exclusive benefit of the surviving spouse and next of kin, proportionate to the pecuniary loss severally suffered by the death. * * *" (At the time of the action the amount of recovery was limited to $17,500.)

demands accrued by reason of any damage, loss, or injury to person or property, or both, including all loss for services resulting from any acts done, omitted, or suffered by the said Henry M. Hanson.

Actions under § 573.02 were also instituted by Theodore Engebretson as trustee of the estate of Steve Ritter against Henry M. Hanson and Fred Howard; and as trustee of the estate of Patricia Ritter against the same parties. Settlements of $8,000 were effected in each of such actions. At that time, in consideration for such settlements, releases were executed and delivered by the trustee releasing and discharging Henry M. Hanson and Fred Howard and their respective insurers, successors, assigns, heirs, and employees from any and all actions, causes of action, claims or demands, by reason of the injury and subsequent death of Steve Ritter and of Patricia Ritter, including the loss to the family and heirs at law of such decedents.

Pursuant to § 573.02 the aforesaid settlements were ordered distributed by the district court as follows:

To Marjorie Howard (not including her separate
    settlement) ....................................$2,666.66
To Darus Howard ...............................$2,666.67
To Doyle Howard ...............................$2,666.67
To Mark S. Ritter (from both estates)................$8,000.00
To Lynn S. Ritter (from both estates)................$8,000.00

In the present proceedings the trial court submitted special interrogatories as follows:

1.  Did the village of Appleton on December 31, 1954, make a sale of intoxicating liquor to Henry Hanson when he was obviously intoxicated?
Answer: Yes.

2.  Was Henry Hanson intoxicated at the time of the collision?
Answer: Yes.

3.  Did such illegal sale proximately contribute to cause intoxication of Henry Hanson at the time of the collision?
Answer: Yes.

4.  Was the intoxication of Henry Hanson a proximate cause of the collision and the resulting injury and damages?

Answer: Yes.

The jury returned verdicts for plaintiffs as follows:

Marjorie Howard .................................. $25,000
Doyle Howard ..................................... $17,000
Darus Howard ..................................... $17,000
Mark S. Ritter ................................... $25,000
Lynn A. Ritter ................................... $25,000

Subsequently, from the evidence adduced and upon the stipulation of the parties, the trial court deducted from such verdicts the amounts received by the various plaintiffs in the distribution of funds by the district court under § 573.02. In a memorandum attached to the order making such deductions the court stated:

"The releases signed by the Trustee in the wrongful death actions do not bar the recovery in this action as the causes are not identical in form, scope and purpose."

The present appeals are from the judgments entered upon the foregoing verdicts and orders. Four questions are presented: (1) Is the evidence sufficient to sustain the finding that defendant sold intoxicants to Hanson when he was obviously intoxicated? (2) Was there sufficient foundation for expert testimony as to alcoholic content of blood taken from Hanson's body after his death? (3) Did the releases in the actions under § 573.02 constitute bars in the present proceedings? (4) Were the verdicts excessive?

The facts appear to be as follows: On December 31, 1954, at about 8 p. m., Fred and Marjorie Howard and Steve and Patricia Ritter left the Howard home 20 miles north of Appleton in a 1949 Oldsmobile driven by Mr. Howard. None of the occupants of this car had been drinking intoxicants. The collision with Hanson's automobile took place about 8:30 p. m. the same evening and appears to have resulted from Hanson's excessive speed and from the operation of his car on the wrong side of the highway. As to Hanson's use of intoxicants prior to the accident, the evidence indicates the following: Subsequent to 2 p. m. that afternoon he had had a bottle of strong beer with one Carl Johnson; one with his brother Oscar; and two drinks of either

strong beer or whiskey with one Ben Bregel, all in defendant's store. Bregel testified that, at that time (about 2:30 p. m.) Hanson "was feeling his oats" and had been giving him "a bad time"; that Hanson had asked Bregel "Are you going to buy or act one." Arthur Nieland, one of the bartenders in defendant's store, testified that there had been some 40 to 50 people in the store and that he had served Hanson several drinks of whiskey during the afternoon; that Hanson had been present at closing about 6 p. m.; that he remembered serving drinks of whiskey to Hanson; and that it was possible that he had served him three or four drinks of whiskey during the afternoon.

There was testimony that Hanson had also consumed a bottle of beer with one Archie Olson in Teske's recreational parlor during the afternoon; that he had had a "Tom and Jerry" at the American Legion Club at about 3 p. m.; that after 3:30 p. m. he had bought whiskey for one V. P. Stotts and had had a bottle of strong beer in defendant's liquor store; and that he had had a bottle of beer with one Mr. Ronglein in Teske's recreational parlor between 4 and 5 p. m.

Gordon Nelson, a neighbor of Hanson, testified that he had been in defendant's liquor store between 5 and 6 p. m.; that he had then seen Hanson standing at the bar there with a glass of whiskey; and that he had observed Hanson's actions and talk, which, in his opinion, definitely showed that Hanson was then under the influence of liquor; that he had "weaved" and had talked with a "thick tongue" and that his words had not been distinct; that, in Nelson's opinion, Hanson was intoxicated at that time.

Mr. Leon D. Holbrook, state highway officer, testified that shortly after the accident he went to the mortuary where Hanson's body had been taken; that he then detected the odor of liquor coming from it and asked Lloyd J. Anderson, the deputy coroner who was present, to take a blood sample from it; that he saw Anderson take two clean, white bottles for such purpose but did not actually see the blood sample taken; that the next day, January 1, 1955, at about 5:30 p. m., at the mortuary he received from Anderson two bottles with blood specimens therein, one labeled "Henry Hanson"; that he kept these in his home until the morning of January 4, 1955, (following the New Year's holidays) and at that time mailed them by registered mail to the Goodwin Joss Lab-

oratories in Minneapolis, from which he subseqently received reports as to their respective alcoholic contents. The bottles were not returned from the laboratories.

Mr. Anderson testified that on the night of the accident a highway officer had called at the mortuary and requested blood samples from both Hanson and Ritter; that Mr. W. I. Wilson, the mortician in whose establishment the bodies had been placed, was present and had taken such samples; that the bottles in which the blood samples were placed had been labeled at the time they were taken but that he did not know if he or Wilson had attached the labels; and that they had then been stored in a refrigerator in the mortuary and that later the highway officer had called for them.

Mr. W. I. Wilson testified that shortly after the accident, at the mortuary, either a highway officer or the deputy coroner had requested that specimens of blood be taken from Hanson and Ritter and that the bottles containing them be labeled; that either he or Anderson, the only ones present, had carried out such instructions; that two clean bottles were used for such purpose; that after the specimens had been taken either he or Anderson, or someone working under his direction, had labeled the specimens with the names of Hanson and Ritter, and placed them in the refrigerator at the mortuary for storage; that he had used his experience and training in taking and labeling the blood samples; and that it was not likely that he had confused the sample taken from Ritter with that taken from Hanson.

Goodwin Joss, proprietor and chief chemist of Goodwin Joss Laboratories, and deputy coroner and toxicological chemist for Hennepin County, testified that on January 5, 1955, he had received by registered mail from Highway Officer Leon D. Holbrook two vials with blood specimens, on one of which was written "Blood of Henry Hanson, December 31st, 1954"; and on the other which was written "Blood of Steve Ritter, December 31st, 1954"; and that on January 5, 1955, he had made an analysis of such blood specimens.

With the foregoing testimony as foundation for the identity of the two bottles containing the blood specimens, Joss was asked to give his analysis as to the ethyl alcoholic content thereof. Defendant objected on the ground that the identity of the specimens had not been established

definitely enough for such testimony. The objection was overruled and the witness then testified that the blood specimen from the bottle labeled "Henry Hanson" contained .18 percent ethyl alcohol by weight (which in his opinion would leave obvious symptoms of intoxication), and that the blood specimen from the bottle labeled "Steve Ritter" was negative as to ethyl alcohol content. He testified further that there was no embalming fluid or formaldehyde in such specimens.

■ We are of the opinion that the evidence is sufficient to support the finding that, shortly prior to the accident, defendant sold intoxicants to Hanson when he was obviously intoxicated in violation of § 340.14. It is clear that he had been drinking strong beer and whiskey in defendant's store and elsewhere throughout the afternoon. Ben Bregel testified that at about 2:30 p. m. he had seen Hanson drinking in defendant's liquor store and that even at that time Hanson was "feeling his oats." There is a mass of evidence relating to the amount of liquor which he consumed thereafter. Between 5 and 6 p. m. Gordon Nelson observed him at defendant's bar with a glass of whiskey in his hand and noted that he was then intoxicated. There is evidence that Hanson was still present there when defendant's employees "closed up" about 6 p. m. If his intoxication was thus obvious to Nelson shortly prior thereto, the jury might properly conclude that it must have been equally obvious to defendant's employees who had sold him the whiskey which Nelson observed. With reference to this issue the trial court properly instructed the jury that:

"* * * The seller is not required to subject a customer to any test to determine whether he is intoxicated, except the test of observation. * * * Unless it appears to the seller that the buyer is obviously intoxicated, or by the reasonable exercise of his powers of observation it should appear that he is intoxicated, the seller may lawfully continue to sell liquor to a customer. When we speak of 'obviously,' that term is defined as that which is easily discovered or seen or understood, or such as is readily perceived by the eye or the intellect, or that which is plain or evident."

The jury's verdict on this issue was adverse to defendant, and there is ample evidence to support its determination. See, Strand v. Village of

Watson, 245 Minn. 414, 72 N. W. (2d) 609.

■ Defendant asserts that the testimony of Anderson and Wilson was not sufficiently definite to establish a foundation for the admission of the expert testimony of Goodwin Joss as to the alcoholic content of the blood specimen taken from Hanson after his death. It is defendant's contention that neither Anderson nor Wilson stated definitely that either of them had taken this blood specimen from Hanson or labeled the vial containing it. It is true that there is some indecisiveness in the testimony of these two witnesses, but it appears quite definite that one of them must have taken the blood specimens from Hanson and Ritter in response to the instructions of the highway officer shortly after the accident, and that one of them, or an employee acting under the direction of Wilson, then labeled the specimens and stored them in the refrigerator. Wilson, the mortician in whose establishment the bodies had been placed, testified that care had been used in taking the samples and that it was not likely that he had confused them. There is nothing to indicate that anyone had mislabeled the bottles or tampered with them at any time while they were at the mortuary, or at any time thereafter.

There is further support for the sufficiency of the identification of the samples in the testimony of Holbrook, the highway officer, that he had detected an odor of intoxicating liquor coming from Hanson's body at the mortuary which had prompted him to order that the blood samples be taken therefrom, and in the positive testimony that none of the occupants in the Howard automobile had been drinking prior to the collision. Based upon all the foregoing, we feel that the trial court did not abuse its discretion in determining that the identification of the two bottles submitted to the laboratories for analysis was sufficient to support the opinion of the chemist as to the alcoholic content found in Hanson's blood. For a notation on this subject, see Annotation, 21 A. L. R. (2d) 1216.

■ Defendant contends the releases delivered in settlement of the wrongful death action constitute a bar in the present proceedings. In Adamson v. Dougherty, 248 Minn. 535, 81 N. W. (2d) 110, we reaffirmed the previous holding of this court that the Wrongful Death Act and Civil Damage Act are wholly unrelated as to scope and purpose. There we held that judgments recovered in a wrongful death action

would not bar plaintiff from establishing in the civil damage action that such judgments did not constitute full compensation for damages sustained and recoverable under § 340.95. This was reaffirmed in Hartwig v. Loyal Order of Moose, 253 Minn. 347, 91 N. W. (2d) 794. In Schmidt v. Driscoll Hotel, Inc. 249 Minn. 376, 82 N. W. (2d) 365, we pointed out that selling intoxicants in violation of § 340.14, subd. 1, which gives rise to an action under § 340.95, constituted a wrong distinct from the negligence involved in a subsequent automobile accident in which the party to whom the intoxicants were sold became involved.

Defendant here is not a joint tortfeasor with the driver of either automobile. Its wrong is distinct from theirs and gives rise to a separate action. The releases delivered in the wrongful death action were based upon a compromise and settlement therein in which the issues of negligence and contributory negligence, as well as the financial responsibility of defendants therein, may have played an important part. They were limited to liabilities arising out of the actions of Hanson in the one case and Howard and Hanson in the other. Recovery therein was contingent upon establishing negligence on the part of such drivers and the absence of contributory negligence on the part of the claimants. The releases did not extend to anyone except defendants and the insurer of defendant Hanson. It is clear that such releases did not constitute a bar to the present proceedings which involve entirely distinct issues and parties. Mantz v. Sullwold, 203 Minn. 412, 281 N. W. 764.

It is true that plaintiffs cannot use the present proceedings as a basis for a double recovery for the same losses. This is made clear in Adamson v. Dougherty, *supra,* and Hartwig v. Loyal Order of Moose, *supra.* By virtue of our decisions in the cases cited, plaintiffs may establish that settlement made in the prior proceeding did not cover full compensation due them. The jury's findings which far exceeded the settlements made are indicative that the settlements were based upon compromises involving questions of liability and financial responsibility and were not to be regarded as full accord and satisfaction for all losses sustained by plaintiffs in the accident. Defendant was not referred to therein and its liability is dependent upon entirely different issues. It seems clear that it cannot assert that such releases inured to its benefit

and relieved it of all liability for its wrongful acts. Of course, it was entitled to have the sums paid therein applied against plaintiffs' recovery against it, but it would be responsible for any excess remaining after such application. By stipulation this was done, thereby bringing the proceeding in line with our decisions in Adamson v. Dougherty, *supra,* and Hartwig v. Loyal Order of Moose, *supra.*[5]

■ Defendant contends the verdicts are excessive. In the Howard actions the survivors included the widow and two children, aged 5 and 3 at the time of the accident. The total recovered for them for loss of support in both actions was $59,000. Decedent Fred Howard was 32 years of age at the time of his death. He was then in good health and engaged in the successful operation of a 350-acre farm with 46 head of cattle, a full line of machinery, two tractors, and a self-propelled combine thereon. He had a life expectancy of 33 years and was the sole support

---

[5]The decision in Ruditis v. Gallop (D. Minn.) 162 F. Supp. 270, 273, is based upon the fact that "Plaintiff * * * accepted a payment as full satisfaction of his injury and executed a release discharging *all* claims he might have for that injury, not only against the releasees, but also against 'all other persons, firms, or corporations' " (italics supplied) which, the court held, would include defendant in the action under the Civil Damage Act. There the court recognized the principle that, if a judgment under § 573.02 did not fully compensate for the loss, or if payment thereunder was for partial compensation only, the injured person, under § 340.95, might recover such additional damages as would make him whole.

In Smith v. Mann, 184 Minn. 485, 239 N. W. 223, and like cases involving malpractice in the treatment of an injury, the decisions hinge upon the fact that a release to the original wrongdoer for all damages due to such injury includes damages for aggravation of the injury due to malpractice under the generally accepted ruling that the latter is the proximate result of the original wrong for which the original wrongdoer is liable where there is no negligence in the selection of the physician. Were the original wrongdoer not liable for injuries arising out of the malpractice, presumably a different rule would be applicable.

Here, as indicated in Schmidt v. Driscoll Hotel, Inc. 249 Minn. 376, 82 N. W. (2d) 365, there are two separate actions differing in scope and purpose, and involving different issues and wrongdoers who are not joint or concurrent tortfeasors. Accordingly, a release in the one action would not mean necessarily that full compensation had been received for the loss sustained so as to absolve the wrongdoer in the second action.

of the survivors.

As to the Ritters, the surviving children were of the ages of 4 and 1 at the time of the death of their parents. The total recovered for them for loss of support in both actions was $50,000. Decedent Steve Ritter had purchased a 320-acre farm in the fall of 1951 upon which he had paid $10,000 up to the time of his death. He owned a full line of farm machinery and stock consisting of between 30 and 40 head of cattle, 200 head of sheep, and a flock of chickens. He was a hard worker and the sole support of the surviving children. He had a life expectancy of 34 years at the time of his death. His wife had a life expectancy of 39.15 years.

In its brief, defendant does not seriously challenge the amount of the verdicts and points to nothing to indicate that they were motivated by passion or prejudice. Under the circumstances, we do not feel that the trial court abused its discretion in refusing to grant a new trial because of the amount thereof.

Affirmed.