THOMAS ARTHUR EISENTRAGER, Appellant, *v.*
THE STATE OF NEVADA, Respondent.

No. 4545

February 1, 1963                    378 P.2d 526

[Rehearing denied March 4, 1963]
See also 76 Nev. 437, 357 P.2d 306.

*Gordon L. Hawkins* and *Tad Porter,* of Las Vegas, for Appellant.

*Harvey Dickerson,* Attorney General, of Carson City; *Edward G. Marshall,* District Attorney, Clark County; and *Charles L. Garner,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, THOMPSON, J.:

During the afternoon of May 7, 1959, Mrs. Faber, the owner of the Alcazar Apartments, and her friend, Mr. Moody, discovered a corpse in the closet of Apartment D. That evening, Eisentrager, the appellant, turned himself in to the police. Subsequently a jury trial occurred, and Eisentrager was found guilty of second degree murder. Judgment was pronounced and sentence imposed. The assigned errors are separately discussed.

1. *The search and seizure of evidence.*

During the trial 28 exhibits were received in evidence, over the defendant's objection that they were gathered during the course of an unreasonable search, and in violation of his constitutional rights. In 1961 the Supreme Court of the United States declared that all evidence obtained by searches and seizures, in violation of the federal constitution, is by that same authority inadmissible in a state court. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. However, it did not tell us what it is that makes a search or seizure unreasonable. Accordingly, each case requires a careful examination of the circumstances in the light of the nature and scope of

the right of privacy which the fourth amendment protects. In Wyatt v. State, 77 Nev. 490, 501, 367 P.2d 104, 110, we said: "Even under the exclusionary rule where the search in question is conducted without a warrant and without requesting permission to enter, the criterion of whether the search is lawful is its reasonableness." As always, the problem of what is reasonable or unreasonable official conduct is one of degree, and the circumstances under which the question is posed are of endless variety.

The record before us reveals that Eisentrager and Ardis Mayo, the decedent, had occupied Apartment D of the Alcazar Apartments since February 12, 1959. They were not married, but held themselves out as man and wife. A bimonthly rent payment was due May 5, 1959, and on that day the landlady called at the apartment and told Eisentrager that she would like to speak to Ardis. She was informed that Ardis had gone to visit a girl friend and would be available later. On the following day the landlady and Mr. Moody again called at the apartment. As no answer was received, they entered to ascertain if the tenants had vacated. No one was there, but personal effects were observed. Finally, on May 7, 1959, still anxious to speak to Ardis Mayo, the landlady and Mr. Moody once more went to the apartment, let themselves in, and upon a more thorough inspection, discovered a corpse (subsequently identified as Ardis Mayo) in a closet covered by a blanket. The landlady asked Mr. Moody to call the police, which he did. The police arrived soon thereafter. They saw the dead body, observed a cloth material tied around the decedent's neck, as well as other physical facts indicating that a killing had occurred. Investigation commenced immediately. On that day drawings of the floor plan were made (Exhibits A, B), photographs taken (Exhibits C, D, E, G-2, G-3, G-4, G-5), and sundry articles of personal property seized. Some of those articles were in plain sight (Exhibit H, a rug; Exhibit M, portion of a pillow case). Others were obtained by search (Exhibit I, rolling pin; Exhibit J, sport shirt; Exhibit K, towel; Exhibit L, other half

of pillow case). The apartment was sealed to preclude entry by others. On the next day, May 8, the police reentered, continued their investigation, and seized additional items of evidence (Exhibit O, towel; Exhibit P, bed leg; Exhibit Q, carpeting), all of which were in plain sight except Exhibit N (trousers). The apartment was again sealed. On May 9 the police completed their work at the apartment, seizing items of clothing of the deceased (Exhibits R, S, T, U, V) which were in plain sight, and Exhibit W, a bath towel, the location of which is not disclosed by the record.[1]

It is reasonably clear that Mrs. Faber looked to Ardis Mayo for payment of rent. Eisentrager was unemployed, and without funds. Indeed, on May 5 he had visited Ardis' employer and obtained a $10 advance on her wages. He and Ardis had quarreled over his inability to obtain work.

Eisentrager was not present at the apartment with the police at any time during their investigation of the killing. The search and seizure was not incident to his arrest.[2] The police did not obtain a search warrant. We are asked to declare the search and seizure unreasonable in the constitutional sense. We decline to do so.

The contention is initially made that the landlady had no authority to allow the officers to enter the apartment. Our attention is directed to the cases of Klee v. United States, 9 Cir., 53 F.2d 58, and State v. Warfield, 184 Wis. 56, 198 N.W. 854. Such contention assumes the existence of the relationship of landlord and tenant. Here, the rent was overdue. The rent payer was dead. The so-called "tenancy" was, for all practical purposes, nonexistent. Surely, when a landlady finds the corpse of her tenant in the apartment she may request the police to investigate, and the police may respond to that request without first obtaining a search warrant. Indeed, even in those cases not involving a

---

[1]The remaining exhibits, blood and hair samples from the deceased, were not obtained at the apartment.

[2]The arrest occurred when Eisentrager turned himself in to the police. NRS 171.230.

homicide and where the landlord-tenant relationship exists without question, entry, search and seizure with the landlord's permission has been held reasonable under certain circumstances. People v. Roberts, 47 Cal.2d 374, 303 P.2d 721. Whether a civil trespass was committed is not of controlling significance. The constitutional prohibition is not against search and seizure without a warrant, but against unreasonable search and seizure. United States v. Rabinowitz, 339 U.S. 56, 60, 70 S.Ct. 430, 94 L.Ed 653; Carroll v. United States, 267 U.S. 132, 147, 44 S.Ct. 280, 69 L.Ed 543. Once it is determined that their conduct is reasonable, it does not become unreasonable in the constitutional sense simply because it may have involved a civil trespass. Cf. People v. Gorg, 45 Cal.2d 776, 291 P.2d 469.

The appellant relies heavily upon United States v. Scott, D.C., 149 F.Supp. 837, where the officers, unsolicited, went to the defendant's apartment to question him about a robbery. They were admitted to the apartment building by the landlord. The door to the defendant's apartment was ajar. The officers entered. The defendant was not present. They waited. How different from the case at bar! Here, the police were present in the apartment by request. They did not initiate entry, and the consequent search and seizure—the owner did. They did no more than to respond to the owner's request for the investigation of circumstances explaining the presence of a corpse. While in the apartment they were justified in making that kind of a search reasonably connected with the purpose of their visit—the investigation of a homicide. Indeed, we perceive no valid reason for a distinction between the sweep or scope of a search and seizure made with a warrant, and one made in its absence.[3] In either instance the constitutional issue is whether the search and seizure is unreasonable. Having observed the corpse and other items

[3]NRS 179.010 provides: "A search warrant is an order in writing, in the name of the State of Nevada, signed by a magistrate, directed to a peace officer, commanding him to search for personal property, or implements used, or evidences of crime, and bring it before the magistrate."

of evidence which were in plain sight and properly seized, People v. Roberts, supra, we do not deem it unreasonable for the officers to have opened a kitchen drawer and a second closet in search for implements used or additional evidences of crime. We are not here concerned with condoning the "lawless activities of law enforcement officers," People v. Cahan, 44 Cal.2d 434, 445, 282 P.2d 905, 911–912, 50 A.L.R.2d 513, but, instead, with an evaluation of their response to the apartment owner's request for an investigation. We believe their response reasonable and in the line of duty. Furthermore, the circumstances reasonably demanded that the officers take possession of the apartment and seal it to forbid tampering, until their work was completed.[4] The fact that parts of three days were required to accomplish their task is unimportant under these circumstances. Cf. Martin v. State, 217 Miss. 506, 64 So.2d 629, cited by appellant, where a return visit to search, without a warrant, was found unreasonable under totally different conditions than presented here.

We conclude that neither an unreasonable search nor an unreasonable seizure, in the constitutional sense, occurs when police officers, upon the landlord's request and without a search warrant, enter a deceased tenant's apartment, observe plain sight evidence of a killing, take control of the premises, and look into closets and drawers for the implements and evidences of the crime.

2. *The foundation for Exhibits X, Y and M.*

Exhibits X and Y are vials which purport to contain samples of Eisentrager's blood. He had given written permission that his blood could be typed. In the presence of a police officer (who testified), a technician at the hospital, by hypodermic needle, extracted blood from Eisentrager's arm and placed the blood thus extracted in two vials. The technician went alone to an adjoining room.

---

[4] Cf. NRS 259.050 directing the coroner to "go to the place where the body is and make an investigation," where death has been occasioned by unnatural means.

Within a very short time (two or several minutes) he returned the vials containing blood to the officer. The samples were later sent to the FBI laboratory, typed, and introduced in evidence through the FBI agent who had made the analysis. The medical technician who withdrew the blood did not testify. It is claimed that an adequate foundation for the introduction of the vials was not established because there is not positive proof that the blood samples which the technician took alone to the adjoining room were the same as those returned a few minutes later to the officer.

The burden is upon the party relying upon expert testimony to prove the identity of the object upon which such testimony is based. However, the practicalities of proof do not require such party to negative all possibility of substitution or tampering. He need only to establish that it is reasonably certain that substitution, alteration, or tampering did not occur. In the present case there is absolutely no indication that the medical technician, who had sole possession of the vials for approximately two minutes, substituted, altered, changed or tampered with their contents, nor is there the remotest suggestion that he may have been interested in doing so. In such circumstances it was proper for the trial judge to admit the evidence and let what doubt, if any, regarding its identity, go to its weight. People v. Riser, 47 Cal.2d 566, 305 P.2d 1; cases collected Annot., 21 A.L.R.2d 1216.

Exhibit M is the portion of a pillow case which was supposed to have been around the decedent's neck. Here again it is claimed that a foundation for its admission into evidence was not established because it was never positively shown that Exhibit M was the object taken from the decedent's neck. We believe that an adequate foundation appears in the record. The mortician in the presence of a police officer removed the outer and undergarments from the decedent "and also something

that was around her neck." The "something" was described to be a "pillow case, or a towel, something of that nature." In any event, it was given to a police officer who marked it with his initials, and later sent it to the FBI laboratory for analysis. It was offered into evidence through the FBI agent who had analyzed it, and who testified that stains of human blood, type A, were on it. The deceased had the same blood type. Furthermore, Exhibit L, which was taken from the kitchen drawer of the apartment, was received in evidence, and the FBI agent gave his opinion, based upon a microscopic comparison, that the two exhibits, M and L, were "originally adjoining portions of the same pillow case." It is evident that a proper foundation was established.

3. *The use of reported testimony was proper.*

It is next urged that the foundation requirement of NRS 178.230,[5] providing for the use of reported testimony in a subsequent trial of the same cause, was not met. The trial court permitted the prosecution to read the testimony of a witness given during the first trial of this defendant. It is claimed that the witness was not proven dead, nor beyond the jurisdiction of the court. We find no merit to this contention. The record shows that two police officers had "spent a considerable amount of time," 16 to 24 man-hours, attempting to locate the witness in Clark County. In addition, they corresponded with a district attorney's office in Arizona, in which state the witness was supposed to have a permanent address, and were advised by an Arizona sheriff of an address in Mexico for the witness. A letter was mailed to the Mexican address, and returned. Also

---

[5]NRS 178.230 provides: "Whenever, in any court of record, the testimony of any witness in any criminal case shall be stenographically reported by an official court stenographer, and thereafter such witness shall die, or be beyond the jurisdiction of the court in which the cause is pending, either party to the record may read in evidence the testimony of the witness, when duly certified by the stenographer to be correct, or otherwise so proved, in any subsequent trial of or proceeding had in the same cause, subject only to the same objection that might be made if the witness were upon the stand and testifying in open court."

an investigator from the district attorney's office spent four days attempting to locate the witness. It is frequently impossible to offer certain proof that a witness is either dead or beyond the jurisdiction of the court. Reasonable diligence must be exercised to locate him. Cf. People v. Raffington, 98 Cal.App.2d 455, 220 P.2d 967. Though the California statute speaks in terms of "due diligence," while the Nevada statute does not, nonetheless we deem "reasonable diligence" or "due diligence" to be the foundation standard. In our view, the record here reflects reasonable diligence, and it was not error to permit the reading of the absent witness' prior reported testimony.

4. *Re the delivery of Exhibit M to the jury during its deliberations.*

The bailiff, without court authorization or counsel's consent, responded to the jury's request that it be permitted to have Exhibit M (the half of a pillow case found around decedent's neck) in the jury room. The bailiff's conduct is cited as reversible error. NRS 175.390 reads: "Upon retiring for deliberation, the jury may take with them:

"1. All papers, except depositions which shall have been received as evidence in the case, or copies of such public records or private documents given in evidence as ought not, in the opinion of the court, to be taken from the person having them in possession.

"2. The written instructions given, and notes of the testimony or other proceedings on the trial, taken by themselves or any of them, but none taken by any other person."

We do not decide whether counsel's consent, court order, singly or together, had such been present, could permit the jury to take an exhibit to the jury room. Without question, error occurred in this case when the bailiff acted on his own volition. Yet we do not consider the error to be prejudicial. NRS 169.110. Exhibit M was properly admitted into evidence. It is permissible for the jury to observe and examine, during trial, exhibits which are properly in evidence. Why a similar

observation and examination should be deemed prejudicial just because accomplished in the jury room, escapes us. In State v. Williams, 50 Nev. 271, 257 P. 619, we found no prejudicial error in allowing the jury to take photographs which were properly received in evidence. We reach the same conclusion here.

5. *The new trial motion was properly denied.*

Before judgment and imposition of sentence, Eisentrager moved for a new trial. He claimed, inter alia, that a fatal variance regarding the cause of death existed between the charge of the information and the proof adduced. The information charged death "by striking the said Ardis Mayo on and about the face, body and head, with his hands, fist and a rolling pin, being approximately ten inches in length and two inches in circumference." [radius] The proof (according to appellant) established death by strangulation. Many authorities are cited. We need not refer to them here. It is sufficient to note that the record contains ample evidence from which the jury could believe the cause of death to be as charged in the information. The expert opinion offered as to cause was:

"I believe that this party died from two causes. I believe that the victim was, or the subject was helpless due to multiple injuries and that the actual cause of death was due to strangulation."

The jury was at liberty to accept or reject all or a part of such opinion. There was much other evidence to prove a beating by use of a rolling pin or similar object. The rolling pin was found to have the decedent's hair on it. Indeed, the doctor's opinion as to the cause of death could reasonably be construed to embrace two causes, beating and strangulation. We find no variance, and hold this assigned error to be without validity.

Affirmed.

BADT, C. J., and MCNAMEE, J., concur.