41366. INTERSTATE LIFE & ACCIDENT INSURANCE COMPANY v. WHITLOCK.

Argued July 8, 1965—Decided September 9, 1965.

218

*Nall, Miller, Cadenhead & Dennis, Theodore G. Frankel, Lynn A. Downey,* for plaintiff in error.

*William Edward Spence,* contra.

FELTON, Chief Judge. ■ Special ground 5 of the amended motion for new trial assigns as error the exclusion of the testimony of Sgt. McKillop to the effect that he had carried the blood of D. J. Whitlock to the State Crime Laboratory. The objection made to the testimony was that the witness did not know what kind of container was in the box or even if blood was in the box.

Even assuming that it was necessary for the witness to have had first-hand, personal knowledge of what kind of container was in the box he transported or that it was, in fact, blood in the container, the absence of this actual personal knowledge does not, under the circumstances, necessarily render the testimony inadmissible. The testimony of Gober (summarized in the statement of facts hereinabove) supplies the missing link of the contents of the package brought by McKillop and received by Gober, i.e., a vial of blood, sealed with adhesive tape, labeled "D. J. Whitlock," and accompanied by the identifying label filled out at the coroner's office. Although the custody of the

sample might be traced by means of Gober's testimony of having received it from McKillop, McKillop's testimony was nevertheless corroborative of Gober's testimony and supplied an important link in the custody of the sample, from the coroner's office to the State Crime Laboratory. There was also a presumption, although admittedly rebuttable, that the contents of the sealed and labeled vial and package were as indicated by the label. The objection was to the lack of McKillop's actual knowledge of the contents, not to the possibility that the blood sample which he carried (which was confirmed by Gober's testimony) might not have been the one taken from the decedent, Whitlock, which possibility arises out of the testimony as to the procedure in the coroner's office before McKillop obtained custody of the sample, on which testimony we hereinafter rule. The court erred in excluding McKillop's testimony, hence in overruling this special ground.

■ Special grounds 6, 7 and 8 complain of the court's ruling out of the testimony of Dr. Tom Dillon indicated by italics in the statement of facts hereinabove and of the sustaining of an objection to a question as to whether the witness had ever deviated from his described usual procedure. The substance of the objections made thereto is that, the issue is, what the witness did with this *particular* blood sample, and since, by his own testimony, he doesn't remember the disposition of this *particular* sample, testimony as to what he *routinely* does is inadmissible.

"[I]t is generally permissible to allow a witness to testify from his own knowledge as to the usual custom or course of dealing involving the business routine of the party involved. . . *Farmers Ginnery &c. Co. v. Thrasher*, 144 Ga. 598 (3) (87 SE 804) ; *Gulf Refining Co. v. Smith*, 164 Ga. 811 (7) (139 SE 716) ; *Burch v. Americus Grocery Co.*, 125 Ga. 153 (3) (53 SE 1008) ; *Butler v. State*, 142 Ga. 286 (6) (82 SE 654) ; *Leonard v. Mixon*, 96 Ga. 239 (23 SE 80, 51 ASR 134)." *Russell v. Pitts*, 105 Ga. App. 147, 149 (123 SE2d 708). *Russell v. Pitts*, supra, upheld the admission of testimony, as to the conditions and procedures in the hospital's emergency room relative to the taking of blood-alcohol samples, by the physician who treated the patient from whom such a sample was taken out of his presence. The tes-

timony of Dr. Dillon in the instant case is even stronger, inasmuch as the usual customs and procedures as to which he testified were those involved in his own office, over which he had direct supervision, responsibility and control and, in many phases of the procedure, he personally performed the necessary duties involved.

The case of Nichols v. McCoy, (1951) (Cal.) 235 P2d 412, held that where it appears that the various steps in the keeping and transportation of the specimen, part, or object from the time it was taken from the body until the time of analysis were not traced or shown by the evidence the identification of the thing analyzed is insufficient and the presumptions that official duty is properly performed and that public records are correct will not supply missing links in the chain. Other cases hold that the identity of the part need not be proved beyond all possibility of doubt, that the circumstances need be such as to establish a reasonable assurance of the identity of the part, and that all possibility of tampering need not be excluded—the above being especially true where there is no evidence to create a suspicion that the part (or sample) was other than that taken or that there was a long, unexplained time lapse involved. Commonwealth v. Mazarella, (1924) 279 Pa. 465 (124 A 163); State v. Smith, (1920) (Mo.) 222 SW 455; State v. Cook (1877) 17 Kan. 392; State v. Thompson, (1896) 132 Mo. 301 (34 SW 31); Ritter v. Village of Appleton, 254 Minn. 30 (93 NW2d 683); Anno. 21 ALR2d 1216.

Although the Medical Examiner was unable to recall the disposition of the specific sample in question due to the large number of cases his office handles, he testified that he did not recall ever having departed from the established routine and there is no evidence of such departure, either in this particular case or any other. The evidence indicates that the sample was handled according to established procedures and was not subjected to any delays in processing. In our opinion it would be entirely unrealistic to expect or require a specific recall of each individual case where the volume of cases is so large and, in most instances, there is nothing out of the ordinary about any given case which would make it subject to special recollection. The court therefore erred in overruling special grounds 6, 7 and 8.

■ Special ground 9 assigns as error the court's exclusion from evidence of a copy of the report of the State Crime Laboratory on the blood-alcohol test made on a sample of the decedent's blood at the request of the Medical Examiner, Dr. Dillon.

"In Georgia records or certificates of facts made by public officials are not admissible in evidence to prove the truth of the facts stated unless there is authority by statute or administrative order to record the facts. *Jones v. Cordele Guano Co.*, 94 Ga. 14, 18 (20 SE 265); Green, The Georgia Law of Evidence, 628, § 317; cf. Kay v. United States, 255 F2d 476, 480 (4th Cir. 1958); 5 Wigmore on Evidence 519, § 1633; 545, § 1639; Anno. 21 ALR2d 1216, 1239." *Pittman v. State*, 110 Ga. App. 625, 627 (139 SE2d 507). In the *Pittman* case, supra, the defendant, who had been involved in an automobile collision, requested the blood-alcohol test provided by Ga. L. 1953, Nov. Sess., pp. 556, 575 (*Code Ann.* § 68-1625 (b, 4)). The State Patrol sent the blood sample to the State Crime Laboratory for analysis and the admissibility of the State Laboratory's report became an issue in the case. This court held as follows: "We find no statute, however, that authorizes an official of the State Crime Laboratory to make alcohol blood [blood alcohol] tests; therefore, the exception to the hearsay rule permitting admission in evidence of records of official acts, as applied in Georgia, does not apply to reports of blood alcohol tests made by this State agency. Cf. Ga. L. 1937, pp. 322, 340; as amended, Ga. L. 1941, pp. 277, 278 (*Code Ann.* § 92A-302); Ga. L. 1953, p. 602 et seq. as amended, Ga. L. 1960, p. 1009 et seq. (*Code Ann.* § 21-203 et seq.)." *Pittman v. State*, supra, p. 628. Ga. L. 1961, pp. 437, 438 (*Code Ann.* § 21-227) provides as follows: "When any person has been admitted to a hospital or morgue as a result of any casualty and for any reason whatsoever is unable to give his consent to the taking of a sample of blood for analytical purposes, the peace officer in charge of the investigation of the circumstances surrounding the casualty may summon a medical examiner for the purpose of extracting a blood specimen in order to analyze the content thereof. The medical examiner shall be entitled to a fee of $5 for performing these services and shall be paid in the same manner as herein-

before set out. *The blood specimen so taken shall be submitted to the Crime Laboratory for analysis by the medical examiner or the peace officer in charge, and a certified report submitted by the laboratory to the submitting officer."* (Emphasis supplied.) The above statute is clearly authority for the State Crime Laboratory not only to make blood-alcohol tests but to make and issue reports on the findings of such tests, at least within the limited scope of this Code section. Furthermore, Ga. L. 1953, pp. 602, 611 (*Code Ann.* § 21-219) provides that copies of "reports in the office of the director of the State Crime Laboratory when duly attested by said director [which the present report was] shall be received as evidence in any court or other proceeding for any purpose for which the original could be received without any proof of the official character of the person whose name is signed thereto." Apparently, the only way to reconcile the broad statement hereinabove quoted from the *Pittman* case, regarding the lack of statutory authority for an official of the State Crime Laboratory to make blood-alcohol tests, with the provisions of *Code Ann.* § 21-227 is to restrict it to the situation in that particular case, even though the court there took cognizance of that and related statutes. As has been indicated, the blood-alcohol test in that case was made pursuant to *Code Ann.* § 68-1625 (b, 4), which provides that the Director of Public Safety is to designate the physicians to administer the test. The State Crime Laboratory is not specifically authorized to make such a test under that particular section, as it is under *Code Ann.* § 21-227.

The *Pittman* case expressly did not decide whether an official record of a blood analysis made by statutory direction or authority would have to be accompanied by evidence showing the identity and chain of custody of the blood to make such a record admissible in evidence, since it was found that the blood analysis in that particular case was not made by statutory direction or authority. Since we have decided that the test in the present case was made by statutory direction or authority, this issue is now before the court. As has been already indicated, *Code Ann.* § 21-219 permits the copy of the report to be received as evidence *for any purpose for which the original*

*could be received.* Since this statute does not change the rules of competency or relevancy, and since the most this evidence could tend to prove is the analysis of the particular sample tested, it would seem necessary for the admissibility of this evidence to lay a proper foundation by showing the identity of the sample tested with the decedent and the chain of custody to render the report admissible as relevant evidence.

It would be unduly lengthy to discuss each detail of the evidence which establishes the chain of custody, which information can be obtained from the statement of facts hereinabove set out. Perhaps the following abbreviated synopsis of this evidence will serve to show that such evidence, if believed, would form a sufficient chain of custody to prove the ultimate fact: The police officer investigating the collision identified the body in the morgue as that of D. J. Whitlock by his personal papers and driver's license. The medical examiner, according to his records, took the blood sample from the decedent on the evening of his death, sealed, labeled and packaged the sample and kept it refrigerated in a locked room in his office overnight. The police officer assigned to the coroner's office as investigator under the medical examiner carried a sealed package labeled with the decedent's name from the coroner's office to the State Crime Laboratory on the following morning. The toxicologist at the State Crime Laboratory received the sealed package from the police investigator and saw that it contained a sealed vial of blood labeled with the decedent's name. The toxicologist ran a routine blood-alcohol test on the sample, following usual procedure and issuing a routine report thereon.

In the *Pittman* case, supra, p. 627, the court listed a number of "missing links" in the chain of evidence as to the identity and custody of the sample. These links are quoted below, with the pertinent evidence in the present case inserted in brackets: "It did not show by whom the blood sample was taken [Dr. Tom Dillon], how the container was labeled [contained decedent's name, age, address, date of receipt, case number, name of person by whom brought in, determination to be made from sample and examining doctor's signature and was filled out by the person receiving the body and the medical examiner], by whom

[Sgt. McKillop] or by what means it was transmitted to the laboratory, when [the morning after the sample was taken] and by whom [Earl A. Gober] it was received." While the above enumeration might not exclude other factors which might be proved to form the chain of evidence, an examination of a number of such cases shows that the chain is as well or better documented here than most of those which have been held sufficient. An examination of the standard used in some of these cases ·may be helpful. In Ritter v. Village of Appleton, 254 Minn. 30, supra, the Supreme Court of Minnesota stated that it was not likely that the mortician who had taken the sample had confused them. *"There is nothing to indicate that anyone had mislabeled the bottles or tampered with them at any time while they were at the mortuary, or at any time thereafter."* (Emphasis supplied.) In State v. Fornier, 103 N.H. 152 (167 A2d 56), the court said: *"It is not necessary that each evidentiary fact relied upon by the State be established beyond a reasonable doubt. . . The ultimate question remains whether on all the evidence it could be found that the blood analyzed by the State chemist was the defendant's blood. . .* No rigid rule to fit every situation can be laid down, but each case must rest on its own facts. . . Considering the entire record, especially the unbroken seal on the container and the writing found therein, *the only logical and sensible explanation* of the situation is that the trooper wrote the transmittal slip, placed it in the container along with the tube of defendant's blood, and that these were what the State chemist received. *Although the exact course by which the container was transferred from the refrigerator in the State Police headquarters to the laboratory of the State chemist was not detailed there was sufficient evidence to warrant a finding that the blood analyzed was the defendant's."* (Emphasis supplied). In a 1963 Florida decision, Urga v. State, 155 S2d 719, 723, the court pointed out that "[n]o evidence was offered by the defense suggesting any laxity in the custodial or laboratory procedures of the Government, or any reason why the exhibits should be regarded as in any way untrustworthy." In Eisentrager v. State, 79 Nev. 38 (378 P2d 526), the Supreme Court of Nevada. held: "The burden is upon the party relying

upon expert testimony to prove the identity of the object upon which such testimony is based. *However, the practicalities of proof do not require such party to negative all possibility of substitution or tampering. He need only to establish that it is reasonably certain that substitution, alteration, or tampering did not occur.* . . In such circumstances it was proper for the trial judge to admit the evidence *and let what doubt, if any, regarding its identity, go to its weight."*

There was a sufficient foundation laid by the evidence in the case at bar to make the copy of the laboratory report admissible; therefore the trial court erred in overruling the special ground of the motion for a new trial excepting to the exclusion from evidence of the document.

■ In ruling on the court's judgment overruling the motion for a new trial on the general grounds, reference is made to the evidence as set forth in the statement of facts, including that which we have held to have been improperly excluded. As has been indicated hereinabove, there was sufficient evidence which, if believed, might form a chain of identity and custody of the blood sample. As to the results of the test, Gober, the State Crime Laboratory toxicologist, testified as to the percentage of alcohol in the sample. This was supported by the copy of the report, which was improperly excluded from evidence. As to the probative value of such evidence on the question of the decedent's intoxication at the time of his death, the *Pittman* case, supra, p. 627, held that generally, in the absence of a statute dealing with the evidentiary effect of blood tests, the probative value of such evidence on the question of a person's intoxication must be shown by expert testimony. Ga. L. 1953, Nov. Sess. pp. 556, 575 (*Code Ann.* § 68-1625 (b, 3)) provides as follows: "If there was at that time 0.15 percent or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of intoxicating liquor." While this presumption is contained in a criminal statute, as this court held in *Russell v. Pitts*, 105 Ga. App. 147, 150 (1), supra, "We are cited to no rule of law which would make such tests, authorized in criminal cases under *Code Ann.* § 68-1625, inadmissible in civil cases." The evidence of 0.30

percent of alcohol in the decedent's blood, having been supported by the evidentiary foundation as above discussed, authorized an inference of intoxication and the jury should have been allowed to decide whether it found in favor of the inference prima facie and if so whether it had been rebutted by the other evidence.

Furthermore, Dr. Fox's testimony, that 95% of persons whose blood contained 0.30% alcohol would be considered clinically intoxicated, was entitled to consideration by the jury. Although the possibility of the decedent's having been among the 5% who would not be intoxicated under these circumstances was not eliminated by the evidence, this testimony could nevertheless be weighed, and with the other evidence be found to preponderate toward the probability of the decedent's intoxication.

The trial court erred in its judgment directing the verdict in favor of the plaintiff and against the defendant for the face amount of the policy and in overruling the general grounds of the motion for a new trial.

*Judgment reversed. Jordan and Deen, JJ,. concur.*