## A94A0978. HORTON et al. v. EATON.

(452 SE2d 541)

McMURRAY, Presiding Judge.

Loyd E. and Betty C. Horton brought a medical malpractice action against Dr. S. Boyd Eaton, Jr., a radiologist, essentially alleging that Eaton's negligent failure to diagnose a neck fracture in Loyd Horton's X-ray films resulted in inappropriate and injurious treatment by other physicians. The Hortons appeal from the judgment entered on a jury verdict in Eaton's favor.

The original injury resulted from a 20-foot fall that occurred when Loyd Horton ("Horton") lost his balance while attempting to cut down a tree in his yard. Horton landed on his shoulders and the back of his head, causing tingling in his hands. Horton was first examined by the family's osteopathic physician (hereinafter "osteopath"). Horton reported he could feel grinding in his head when he turned it. Since the osteopath did not have a technician available at that time, he sent Horton to the emergency room at West Paces Ferry Hospital to obtain X-rays. There Horton was examined by a medical doctor who ordered X-rays of Horton's spine and left knee. The examining physician told Horton that he had torn muscles and ligaments, and also that he had arthritis in his neck. Horton was given a prescription for a muscle relaxer and for pain, and was instructed to return to the osteopath for follow-up.

Sometime after Horton was discharged, Dr. Eaton received the X-ray films of Horton's cervical spine along with a radiology request form. He issued a report stating that he did not see any fractures. Dr. Eaton had no contact with Horton nor with any other physician before issuing his report.

Two days later Horton returned to the osteopath's office for a follow-up visit as instructed. At that time Horton still experienced a

grinding sensation as his head moved, but other symptoms had not yet manifested themselves. Within a week to ten days, however, the right side of Horton's face became numb, and there was a lump in his throat that made it very difficult to swallow. At the same time he began experiencing a "constant" ache on the right side of his head. He also began having trouble achieving a full erection.

Horton returned to the osteopath soon after the onset of these symptoms. Having been told of Horton's symptoms, the osteopath "manipulated" Horton's neck by turning his head up and down and side to side, causing Horton to roll his body to prevent more extensive manipulation. No further X-rays were taken at that time. During a subsequent visit, however, the osteopath did have follow-up X-rays done using his own technician. Concluding that Horton had a vertebra out of place, the osteopath referred him to Dr. Tarek Nessouli, an orthopedic surgeon. Upon viewing these latest X-rays, Dr. Nessouli instructed Horton not to move, informing him that his neck was broken. Specifically, the fracture was located in the area where the first cervical vertebra, which holds the skull, fuses to the body of the second cervical vertebra, forming an area referred to as the "odontoid process." Horton eventually underwent neurosurgery. Horton complained at trial of continuing numbness, headaches, a "lump" in his throat, total impotence, depression, and a general weakness in his right side.

The Hortons initially brought suit against Dr. Eaton, later adding the osteopath and the doctor who originally examined Horton at the hospital.[1] The added parties eventually settled with the Hortons and were dropped from the case, leaving Dr. Eaton as the sole defendant. Dr. Eaton testified at trial that the original X-ray films presented, and his interpretation reflected, a "false negative," and that X-rays taken after manipulations by the osteopath showed an obvious fracture. Dr. Eaton further testified that in his opinion the odontoid fracture would have held its position and there would have been fewer medical problems but for the neck manipulations applied by the osteopath. Dr. Eaton maintained that his original interpretation of Mr. Horton's X-rays was within the applicable standard of care under the circumstances. His own expert corroborated this conclusion, but affirmed on cross-examination that Dr. Eaton would have been held to a higher standard of care (i.e., required to perform additional testing) had the X-ray requisition form directed to Dr. Eaton from the emergency room (but lost from the hospital's medical records) advised that the patient was experiencing neck pain. *Held*:

---

[1] The names of the latter two physicians have been intentionally omitted since neither testified at trial, and therefore neither was heard with respect to the actions that have been imputed to them.

1. The Hortons contend that Dr. Eaton was erroneously allowed to testify as to the appropriate standard of care for an osteopathic physician, a matter on which Dr. Eaton openly conceded he was not qualified to testify. This enumeration is without merit.

Even assuming that the matter was properly preserved for appellate review, we do not interpret Dr. Eaton's testimony in the manner urged by the Hortons. Dr. Eaton testified that *"everybody* knows we ought not to mess around the neck where there's been an injury," and that it would not be sufficient for someone in the osteopath's position to rely on a radiologist's original findings alone before manipulating Horton's neck given that "there's a false negative rate [for fractures] from 20 to 40%" with respect to initial X-ray films. Dr. Eaton was certainly authorized to testify in absolute terms regarding the extent to which *his own* findings should (and should not) be relied upon by other health care professionals in charting a course of treatment. We note that while Dr. Eaton did not hesitate to suggest that all medical doctors should be aware of the shortcomings inherent in a radiologist's initial findings, he expressly refrained from testifying that osteopathic physicians should likewise be aware of such limitations. Taken as a whole and viewed in its proper context, we find nothing improper in the challenged testimony.

2. In their second enumeration, the Hortons challenge the propriety of allowing Dr. Eaton to testify as to the likely contents of an emergency room requisition for an examination and diagnosis of Mr. Horton's X-rays. The record indicates that such requisition orders may include a general description of the type of X-rays needed, the nature of injury giving rise to the need for X-ray evaluation, the incident which purportedly caused a patient's injuries and symptoms displayed or reported by the patient upon presentation in the emergency room. In this vein, Dr. Eaton's own expert affirmed on cross-examination that if the requisition form had contained information regarding pain in the patient's neck, the requisite standard of care would have required more studies than Dr. Eaton performed. It thus becomes apparent that the remarks on Mr. Horton's emergency room X-ray requisition order are key to framing the standard of care upon which to measure Dr. Eaton's diagnosis of Mr. Horton's X-rays.

The emergency room requisition form was not available to the Hortons because it mysteriously disappeared from the medical records of Dr. Eaton's place of employment. While this omission left a gap in the Hortons' case against Dr. Eaton, it was not fatal to their cause. OCGA § 24-4-22; *J. B. Hunt Transport v. Bentley*, 207 Ga. App. 250, 256 (3) (427 SE2d 499). On the other hand, Dr. Eaton's failure to produce the emergency room requisition form and testimony that he does not recall the remarks on the requisition order (regarding circumstances of the need for X-ray examination and eval-

uation) left Dr. Eaton with no evidence to support his defense that he exercised the requisite standard of care in diagnosing Mr. Horton. However, the trial court permitted Dr. Eaton to dodge this omission by allowing him to speculate as to the likely contents of the X-ray requisition form, i.e., the form probably stated no more than the patient "fell out of a tree." The foundation for admission of this testimony was Dr. Eaton's alleged familiarity with the general habits and customs of unnamed emergency room personnel. It is our view that this foundation provides no credibility to the testimony upon which it is based.

"A witness may testify as to his fixed and uniform habit in such cases but not as to the habit and customs of another. See *Leonard v. Mixon*, 96 Ga. 239 (23 SE 80). Compare *Farmers Ginnery & Mfg. Co. v. Thrasher*, 144 Ga. 598, 599 (3a) (87 SE 804); *Gulf Refining Co. v. Smith*, 164 Ga. 811, 812 (7) (139 SE 716); *Burch v. Americus Grocery Co.*, 125 Ga. 153 (3) (53 SE 1008); *Russell v. Pitts*, 105 Ga. App. 147, 149 (123 SE2d 708); *Interstate Life & Acc. Ins. Co. v. Whitlock*, 112 Ga. App. 212, 219 (144 SE2d 532)." *Stephen W. Brown Radiology Assoc. v. Gowers*, 157 Ga. App. 770, 782 (7), 783 (278 SE2d 653). In the case sub judice, *Dr. Eaton's testimony regarding the likely contents of the requisition order for evaluation of Mr. Horton's X-rays was nothing more than speculation, based on his perception of the general habits and customs of others.* By allowing such guess-work testimony, the trial court permitted Dr. Eaton to benefit from his omission of record and memory by blocking the Hortons' efforts to get at the true contents of the X-ray requisition form while giving him the benefit of an unimpeachable version of the contents of the X-ray requisition order, i.e., a version which happens to favor Dr. Eaton's claim that he employed the requisite standard of care in diagnosing Mr. Horton's X-rays. Consequently, since there is no question that the remarks on the emergency room X-ray requisition form are key to framing the standard of care upon which to measure Dr. Eaton's diagnosis of Mr. Horton's X-rays, admission of Dr. Eaton's testimony regarding the likely contents of this document was error.

3. In their third enumeration, the Hortons contend the trial court erred in allowing Dr. Eaton's expert to answer a hypothetical question which assumed an essential fact not in evidence.

"[A]n expert witness is not permitted to give his opinion, in answer to a hypothetical question, based on facts not placed in evidence by other witnesses. See Code § 38-1710[, now OCGA § 24-9-67]; *Ellis v. Southern R. Co.*, 89 Ga. App. 407 (1) (79 SE2d 541); *Norman v. Allen*, 118 Ga. App. 394 (2) (163 SE2d 859)." *Braswell v. Owen of Ga.*, 128 Ga. App. 528, 529 (1) (197 SE2d 463). In the case sub judice, the trial court allowed Dr. Eaton's expert to answer a hypothetical question (regarding the standard of care exercised by Dr. Eaton) based on

the assumption that the X-ray requisition form provided to Dr. Eaton at the time he evaluated Mr. Horton's X-rays advised only that the patient "fell from tree." Admissible evidence of this assumed fact was never admitted into evidence at trial. Consequently, the trial court improperly allowed the response to the above hypothetical question. The case sub judice must be sent back for a new trial. Both sides must then deal with the lack of evidence regarding the framework upon which to measure the Hortons' claim that Dr. Eaton failed to exercise the requisite standard of care in evaluating Mr. Horton's X-rays and diagnosing the patient's broken neck.

4. Next, the Hortons contend the trial court erred in giving a charge on hindsight. The hindsight charge "becomes appropriate in a medical malpractice case where the evidence raises an issue as to whether the negligence claim is based on later acquired knowledge or information not known or reasonably available to the defendant physician at the time the medical care was rendered. [Cit.]" *Barnes v. Wall*, 201 Ga. App. 228, 232 (4) (411 SE2d 270). The evidence presented in this case raises such an issue, and the trial court therefore did not err in giving a charge on hindsight.

*McCoy v. Alvista Care Home*, 194 Ga. App. 599 (391 SE2d 419), is distinguishable in that the uncontested facts in *McCoy* showed that plaintiff's case was based on facts known to the defendant at the time of the incident in question. In the case sub judice, what Dr. Eaton knew or should have known at the time he examined Horton's X-rays was hotly disputed. The evidence authorized a finding that Dr. Eaton became aware of Horton's precise complaints only after he evaluated Horton's X-rays. We therefore find no error. See *Haynes v. Hoffman*, 164 Ga. App. 236, 238 (3) (296 SE2d 216).

5. Since the trial court deleted the only language to which the Hortons objected in Dr. Eaton's requested charge with respect to a patient's duty to mitigate damages by following the advice of his physician, the Hortons' remaining enumeration presents nothing for review. OCGA § 5-5-24.

*Judgment reversed. Pope, C. J., Birdsong, P. J., Beasley, P. J., Johnson, Blackburn and Ruffin, JJ., concur. Smith and Andrews, JJ., dissent.*

SMITH, Judge, dissenting.

I must dissent. In Division 2, the majority states that "the remarks on Mr. Horton's emergency room X-ray requisition order are key to framing the standard of care upon which to measure Dr. Eaton's diagnosis of Mr. Horton's X-rays." This is correct, but insufficient to state with accuracy the issue before us. I observe that it was absolutely crucial to the Hortons' case that they be allowed to suggest *without contradiction* that the nonexistent requisition form would

have indicated in detail Mr. Horton's symptoms. This unsupported position *was* contradicted, however, and *all* of the evidence indicates that the scenario put forth by the Hortons is unlikely.

The majority cites OCGA § 24-4-22, which provides: "If a party has evidence in his power and within his reach by which he may repel a claim or charge against him but omits to produce it, or if he has more certain and satisfactory evidence in his power but relies on that which is of a weaker and inferior nature, a presumption arises that the charge or claim against him is well founded; *but this presumption may be rebutted.*" (Emphasis supplied.) Even if it is assumed that Dr. Eaton should not have testified as to what he typically sees on requisition forms because it might implicate the habit or custom of others, such error was manifestly harmless and merely cumulative of other evidence presented. The Hortons' own expert testified that "fell from tree," or a similar statement, "is as much information as [radiologists] frequently get."

The evidence is uncontradicted that Dr. Eaton never examined Mr. Horton; that with respect to the information he receives on a patient, he essentially was at the mercy of the treating physician (who was not called as a witness); and that typically radiologists do not get the information they should be given. Moreover, Dr. Eaton testified that he has made efforts to improve the quality of information typically found on x-ray requisition forms, but to no avail. Finally, I note that there is *no* evidence that Dr. Eaton is responsible for the "mysterious disappearance" of the x-ray requisition form. Mr. Horton was *not* in any sense Dr. Eaton's patient, and it is just as plausible to speculate that Horton's treating physician had reason to remove the form from Horton's medical file.

The majority twists the case before us by suggesting that Dr. Eaton had no evidence to support his "defense" that he exercised the proper standard of care. On the contrary, the Hortons could present no evidence indicating that Dr. Eaton failed to exercise that standard, and there is no evidence to support an inference against Dr. Eaton under OCGA § 24-4-22.

I also must dissent as to Division 3, because, as the majority neglects to disclose, testimony was *also* given as to the proper standard of care assuming that the requisition form gave *detailed* information. Since the defense expert testified as to a range of hypothetical facts that would be both favorable and unfavorable in evaluating Dr. Eaton's conduct, I see no danger that the jury assumed facts not in evidence in reaching its verdict.

No harmful error has in any way tainted the verdict reached in this case. I would affirm.

I am authorized to state that Judge Andrews joins in this dissent.

DECIDED DECEMBER 5, 1994 —
RECONSIDERATION DENIED DECEMBER 20, 1994 — 

*Nall, Miller, Owens, Hocutt & Howard, Robert L. Goldstucker, Charles R. Carson,* for appellants.
*Alston & Bird, Judson Graves, Holly B. Barnett,* for appellee.