STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. JOSEPH MARK, DEFENDANT-APPELLANT.

Argued September 13 and November 8, 1965.
Decided January 24, 1966.

264

*Mr. Edmund R. Bernhard* argued the cause for appellant (*Messrs. Herr and Fisher,* attorneys).

*Mr. Barrie T. McIntyre,* Assistant Prosecutor, Hunterdon County, argued the cause for respondent (*Mr. William R. Stem,* Prosecutor of Hunterdon County, attorney).

The opinion of the court was delivered by

JACOBS, J. The defendant was indicted for the murder of Stanley Wlodarski and thereafter moved to suppress various

items which had been seized by the State. His motion was denied and he appealed to this Court pursuant to leave granted under *R. R.* 3:2A–10.

In December 1964 the defendant rented a room in premises located at 39 North Main Street, Flemington and owned by the Kuhl brothers. The rental was on a week-to-week basis from Friday through Thursday. On Saturday, January 16, 1965 the defendant notified his landlord Donald Kuhl, who acted for himself and his brother in renting the room, that he would terminate his tenancy on the following day, Sunday, January 17. At about noon on Sunday the defendant turned in his key to Donald and received a rental refund. Donald testified that when the key was turned in, the defendant was ready to leave and "had everything packed"; he testified further that the sum retained by him represented the rental for Friday and Saturday, January 15 and 16 and that he understood the tenancy was over when the key was returned.

The defendant planned to leave about noon on Sunday and had asked his friend Henry Zyck to help him with his moving. When Zyck was delayed, the defendant asked Donald to call a taxi for him and that was done. Before the taxi came, Zyck had arrived and told the defendant that he was going across the hall to say hello to his friend Stosh (Stanley Wlodarski). Zyck entered Wlodarski's room, found his body, and immediately called the Flemington police. Chief Evans and another officer arrived quickly and found Zyck at the entrance to the house and the defendant at the open door to his room. The Chief then entered Wlodarski's room, found it ransacked and saw Wlodarski's body "in a kneeling crouched position on the floor." As he left Wlodarski's room, the Chief asked the defendant and Zyck if they would stay as he wanted "to ask some questions later." The defendant's room was open and the defendant invited the Chief in to have a drink of wine. The Chief came into the room and although he had nothing to drink, he stayed "maybe ten minutes." While there, he noticed that the defendant "had his stuff packed"

and, in response to an inquiry, was told that the defendant was "moving to the hotel." Leaving Patrolman Horvath in charge, the Chief returned to his own home and called Trooper Martin of the State Police and County Detective Bastedo.

Trooper Martin arrived at about 1:30 P. M. He observed the open door to the defendant's room and was taken to Wlodarski's room by Chief Evans. He saw the body and the ransacked condition of the room. As they were leaving, the Chief pointed out "what appeared to be a footprint on the white door going into Wlodarski's bedroom"; the Chief also noted that "the night chain had apparently been on because the screws were pulled from the wall." Trooper Martin saw the defendant, whom he had known before, and asked him where he lived. The defendant pointed to his room (he was then standing in front of it) and invited the trooper to come in for a glass of wine. As the trooper entered the room, he saw "suitcases and paper bags of clothing" and the defendant told him he was moving that day. The trooper saw a pair of tan work shoes under the bed, picked one up and "noticed the pattern was very similar to the one on Wlodarski's door"; he also noticed that the room in general "was very upset" and indicated that the defendant "had very recently finished packing."

The trooper remained in the defendant's room for a short time and when he came out he discussed the situation with Chief Evans and the other officers present. Following this discussion, the Chief asked the defendant and Zyck to accompany Patrolman Horvath and another officer to the State Police barracks in Flemington. The trooper remained in the house until the County Coroner arrived and reported that Wlodarski had a wound in the chest which he believed to have been caused by a shotgun. Thereafter he returned to the State Police barracks. At about 3 A. M. on Monday, January 18, the trooper, accompanied by Patrolman Horvath, delivered the defendant to the Hunterdon County jail. Although no complaint had yet been filed, the trooper "felt a complaint would be signed the first thing in the morning." At the time

the defendant was delivered to the jail, a printed form captioned "Request For Temporary Commitment" was signed by the trooper as the "arresting officer" and by the jail warden as the "receiving officer." Although the written words "material witness" were filled in over the printed words "charge or complaint," it seems clear that this was done only because it was erroneously assumed to be a proper designation pending the formal filing of written complaint under *R. R.* 3:2–1. The written complaint charging the defendant with the murder of Wlodarski was signed and filed by Patrolman Horvath at 10 A. M. on Monday, January 18, and the written warrant for the defendant's arrest was issued immediately thereafter.

At about 3 P. M. on January 18, after having conferred with Chief Evans, Trooper Martin and other officers, Patrolman Horvath appeared before a Hunterdon County judge for the purpose of obtaining a search warrant. He submitted an affidavit which he had executed setting forth that he had probable cause to believe that certain property ("consisting of a 12 gauge shotgun, shells, shoes and clothing," and a "watch, wallet and papers" connected "with the death of Stanley Wlodarski" and "the violation of the penal laws of the State of New Jersey") was located in a room which had been rented by Joseph Mark in the North Main Street property owned by Donald Kuhl; that Mark's room was directly across from Wlodarski's room; and that Mark had admitted being in Wlodarski's room "during the past weekend, during which time the deceased was found." The County Judge, after having sworn the officer, addressed several questions to him. Responses to these questions indicated that evidence had been uncovered leading to the arrest of Joseph Mark, that the officer considered it necessary to examine Mark's personal belongings and to ascertain whether the room contained any of Wlodarski's personal property or "any weapon which might have been used in the killing," and that the officer was satisfied that the warrant was needed in order to examine into the facts and circumstances surrounding the killing of Wlodarski.

The County Judge isued a search warrant which specifically described the place to be searched and the things to be seized and a search of the room formerly occupied by Mark was immediately made by Chief Evans and Trooper Martin. They seized three unspent twelve-gauge shotgun shells which the trooper found under the cushion of an "overstuffed chair" in the room, as well as the shoes which have already been described. They also seized a shotgun shell which the trooper found in a locked box and miscellaneous other items including apparel, a wallet, a throw rug and newspapers. No shotgun was found in the room. On the following day, Tuesday, January 19, a light switch plate was removed from the room along with a piece of molding from its door; these items bore blood spots. At the same time the door to Wlodarski's room was taken. All this was done with the cooperation of the landlord Donald Kuhl. Indeed, it may readily be inferred from the record that the visits by the officers on both January 18 and January 19 and the taking of the various items had the consent and approval of Kuhl. On January 20, at about noon, Trooper Martin obtained from the Hunterdon County jail warden, clothing which Mark had on when he was first committed; in particular the trooper wanted Mark's trousers on which he had noticed a bloodstain.

In due course the Hunterdon County Grand Jury returned a murder indictment against the defendant. Thereafter the defendant served notice of motion to suppress the shoes, shells, light switch plate, molding and other items taken from the room and the clothing taken at the Hunterdon County jail. After hearing argument, the County Judge orally denied the motion, reserving however to the defendant, the right to renew it "at a later date or at the time of trial." The formal order of denial contained no reference to renewal of the motion. We granted the defendant's application for leave to appeal, heard oral argument and then remanded the matter for further testimony and findings as to the circumstances surrounding the arrest and the seizures. After taking testimony, the County Judge found (1) that the evidence over-

whelmingly established that the defendant had invited the officers into his room on January 17, (2) that Trooper Martin then saw the defendant's shoes which appeared to him to have a pattern similar to the imprint he had seen on Wlodarski's door, (3) that the defendant's tenancy had, under the testimony, expired at noon or at 1 P. M. on Sunday and, in any event, before the issuance of the search warrant and the search, and (4) that the defendant's clothing was taken from his person "for routine examination" and additionally because the trooper had noticed a spot of blood on the trousers.

On reargument, the defendant reiterated his earlier contentions in support of his position that all of the items taken by the officers from his room and his person were seized illegally and should therefore be suppressed. The State expresses interest only in the shoes, the shells, the light switch, the molding and the trousers, and we shall therefore confine our attention solely to those items. Its position is that the defendant was lawfully arrested on January 17, that the search warrant was lawfully issued on January 18, that the seizures were valid on one or more grounds, and that the lower court properly denied the application to suppress. Our first inquiry may appropriately be addressed to the original arrest of the defendant and the presence of probable cause therefor. See *State v. Contursi,* 44 *N. J.* 422, 428–433 (1965); *Ellison v. United States,* 93 *U. S. App. D. C.* 1, 206 *F. 2d* 476, 478–479 (1953); *cf. Brinegar v. United States,* 338 *U. S.* 160, 175–177, 69 *S. Ct.* 1302, 93 *L. Ed.* 1879, 1890–1891 (1949); *State v. Burnett,* 42 *N. J.* 377, 386–388 (1964).

When the police officials of Flemington received Zyck's telephone call on January 17, they responded expeditiously and acted reasonably all along the way. There had been a homicide and the defendant was the only person in the premises when the body was discovered by Zyck. Chief Evans properly asked the defendant and Zyck to remain for questioning while he examined the decedent's ransacked room, and when the defendant invited him in to his own room, the Chief quickly observed that the defendant was

packed and about to move. When Trooper Martin was invited in by the defendant he made the same observation. In addition, he picked up a shoe and noticed that the pattern on its sole was similar to the imprint he had noticed on the decedent's door. The defendant voiced no objection to the conduct of the trooper in picking up the shoe which was in open view, and we find nothing legally offensive in it; as the California Supreme Court said when dealing with a somewhat comparable situation in *People v. Roberts,* 47 *Cal. 2d* 374, 303 *P. 2d* 721 (1956), there is no reason "in law or common sense why one of the officers could not pick up the radio and examine it for the purpose of dispelling or confirming his suspicions. The fact that abuses sometimes occur during the course of criminal investigations should not give a sinister coloration to procedures which are basically reasonable." 303 *P. 2d,* at *p.* 724. See *Ellison v. United States, supra,* where the court aptly noted, that, "Law enforcement is difficult enough, without requiring a police officer to free his mind of clues lying flatly before him." 206 *F. 2d,* at *p.* 478; see also *Petteway v. United States,* 261 *F 2d* 53, 54 (4 *Cir.* 1958) ; *Commonwealth ex rel. Bowers v. Rundle,* 200 *Pa. Super.* 496, 189 *A. 2d* 910, 911–912, *certiorari* denied 375 *U. S.* 916, 84 *S. Ct.* 215, 11 *L. Ed. 2d* 154 (1963).

When he saw that the shoe pattern matched the imprint on the decedent's door, the trooper was satisfied that cause existed for the defendant's arrest and that his official responsibility was to act accordingly; as he put it, "After I had the occasion to enter Mr. Mark's room and saw the shoes, I would not have let Mr. Mark out of my custody." And while the precise moment of the defendant's arrest may be viewed as somewhat obscure, he may fairly be considered as having been under arrest from that time on. See *State v. Contursi, supra,* 44 *N. J.,* at *pp.* 433–434; *State v. Doyle,* 42 *N. J.* 334, 342 (1964) ; *cf. Henry v. United States,* 361 *U. S.* 98, 103, 80 *S. Ct.* 168, 4 *L. Ed. 2d* 134, 139 (1959) ; *Monroe v. Pape,* 221 *F. Supp.* 635, 642 (*N. D. Ill.* 1963) ; *State v. Romeo,* 43 *N. J.* 188, 205 (1964), *certiorari* denied 379 *U. S.*

970, 85 *S. Ct.* 668, 13 *L. Ed. 2d* 563 (1965). That probable cause then existed seems to us beyond question. The decedent's body in a pool of blood in his ransacked room, the room immediately across the hallway with its sole occupant all packed and ready to leave, and the shoes with the pattern matching the imprint on the decedent's door were, in combination, clearly enough to warrant a reasonable belief on the trooper's part that the defendant was responsible for the death of Wlodarski.

██ It must be borne in mind that probable cause means less than legal evidence necessary to convict though more than mere naked suspicion. It is a commonsensible rather than a technical concept. It deals with the reasonable probabilities upon which officers must often act quickly for the protection of society rather than with the proof beyond reasonable doubt which the State must have to proceed to trial and conviction. In *Brinegar v. United States, supra,* Justice Rutledge, after discussing the standards applicable to probable cause as distinct from guilt and conviction, put the matter forthrightly:

"These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." 338 *U. S.,* at *p.* 176, 69 *S. Ct.,* at *p.* 1311, 93 *L. Ed.,* at *pp.* 1890–1891.

██ Having arrested the defendant with probable cause it would have been entirely reasonable if the officers had then made an incidental search of his person and premises. See *Preston v. United States,* 376 *U. S.* 364, 367, 84 *S. Ct.* 881, 11 *L. Ed. 2d* 777, 780 (1964) ; *Ker v. State of California,* 374

*U. S.* 23, 41, 83 *S. Ct.* 1623, 10 *L. Ed 2d* 726, 742 (1963); *State v. Doyle, supra,* 42 *N. J.* at *pp.* 342–345; *cf.* Collings, "Toward Workable Rules of Search and Seizure—An Amicus Curiae Brief," 50 *Calif. L. Rev.* 421, 437 (1962); Kaplan, "Search and Seizure: A No-Man's Land in the Criminal Law," 49 *Calif. L. Rev.* 474, 490 (1961); Note, "Search and Seizure," 59 *Nw. U. L. Rev.* 611, 617–618 (1964). Such incidental search is customarily justified in the cases by the need of seizing any weapons which the defendant might use to assault the arresting officer or to effect an escape and the further need for preventing the destruction of any incriminating evidence on the defendant's person or under his immediate control. See *Preston v. United States, supra,* 376 *U. S.,* at *p.* 367, 84 *S. Ct.,* at *p.* 881, 11 *L. Ed. 2d,* at *p.* 780.

In *Preston,* the Supreme Court reaffirmed the foregoing though it refused to sustain a search without written warrant of the defendants' car where the search was first made after the defendants had been arrested on a flimsy charge of "vagrancy," their car had been driven by an officer to police headquarters, and then had been towed to a garage where its glove compartment and trunk were opened and were found to contain incriminating materials including loaded revolvers. The court thought the search was "too remote in time or place to have been made as incidental to the arrest" (376 *U. S.,* at *p.* 368, 84 *S. Ct.,* at *p.* 884, 11 *L. Ed. 2d,* at *p.* 781). Since *Preston* was handed down it has often been differentiated in individual situations where the reasonableness of the search was thoroughly apparent though it was actually a deferred examination of property taken into possession by the police upon an arrest with probable cause on a serious criminal charge. See *State v. Fioravanti,* 46 *N. J.* 109, 123–124 (1965); *Johnson v. State,* 238 *Md.* 528, 209 *A. 2d* 765, 770 (1965); *People v. Green,* 45 *Cal. Rptr.* 371, 375 (*D. Ct. App.* 1965); *State v. Putnam,* 178 *Neb.* 445, 133 *N. W. 2d* 605, 609 (1965); *People v. Morgan,* 21 *A. D. 2d* 815, 251 *N. Y. S. 2d* 505, 506 (1964), remanded on other grounds, 15 *N. Y. 2d* 914, 258 *N. Y. S. 2d* 650, 206 *N. E. 2d* 656

(1965); *cf. Price v. United States,* 348 *F.* 2d 68, 70 (*D. C. Cir.* 1965); *Arwine v. Bannan,* 346 *F.* 2d 458, 468 (6 *Cir.* 1965).

▉▉ In any event, we need not pursue *Preston* for the officers here did not place reliance on any continuing search incidental to the arrest (*cf. State v. Bindhammer,* 44 *N. J.* 372, 380 (1965)), or on any doctrine of urgent necessity (*State v. Naturile,* 83 *N. J. Super.* 563, 568 (*App. Div.* 1964)), but took the cautionary course of obtaining a search warrant before beginning their search. While the written affidavit, as supplemented by the oral testimony before the County Judge (*R. R.* 3:2A–3), might well have been more complete, we are not now disposed to hold it fatally deficient in the light of the aggregated circumstances. This Court has held that the State must make the issuing judge aware of underlying facts which would justify a prudent man in believing that an offense has been or is being committed (*State v. Macri,* 39 *N. J.* 250, 257 (1963)); but it has also held that the State need not disclose all of its evidence, that trustworthy hearsay is admissible (*State v. Burrachio,* 39 *N. J.* 272, 275 (1963)), that the issuing judge's finding that probable cause existed will be considered as a substantial factor tending to uphold the validity of the warrant, and that his action in issuing it will not be upset on appeal though the matter be viewed as a close one. *State v. Zuzulock,* 39 *N. J.* 276, 281 (1963). See *State v. Boyd,* 44 *N. J.* 390 (1965):

"We had occasion in *State v. Macri,* 39 *N. J.* 250 (1963), and *State v. Zuzulock,* 39 *N. J.* 276 (1963), to review at length the requirements of the Federal and State Constitutions with respect to search warrants, and to promulgate standards to be met in the way of recital of facts in affidavits submitted to the appropriate judge to support the application for such warrants. In those cases we recognized that usually the affidavits are prepared in the midst and haste of criminal investigations, and by police officers and detectives who are laymen not possessed of the expertise in draftsmanship to be expected of a member of the bar or bench. Consequently a common sense approach must be taken in appraising the sufficiency of the factual allegations of the affidavit on which the request for the warrant is based. If the recitals would provide reasonable support for the belief of a prudent man that

the law is being violated at a place reasonably identified, they will be deemed sufficient. Rigid and technical demands for elaborate specificity and precision are neither serviceable nor required in this area of criminal law enforcement. See *United States v. Ventresca*, 380 *U. S.* 102, 85 *S. Ct.* 741, 13 *L. Ed. 2d* 684 (1965) ; *State v. Zuzulock, supra; R. R.* 3 :2A–6 (b)." 44 *N. J.*, at *pp.* 392–393.

■ Before the application for search warrant was presented, an arrest of the defendant with probable cause had been made and a formal complaint charging him with the murder of Wlodarski had been filed. Patrolman Horvath's affidavit, along with his sworn answers to the County Judge's inquiries, disclosed that the defendant had a rented room directly across from that occupied by Wlodarski and had been in Wlodarski's room during the weekend of the finding of the body, that the officers had uncovered evidence which led them to arrest the defendant and charge him with murder, that the warrant was desired in order to ascertain whether the weapon used in the killing and any personal property of Wlodarski, were in the defendant's room, and that the officers believed that the warrant was necessary to examine into the facts and circumstances surrounding the death. The County Judge omitted further questioning of Patrolman Horvath, though that would have been the wiser and safer course, because he was satisfied that there was probable cause for the issuance of the warrant. The warrant he did issue was clearly specific enough with respect to the place to be searched and the things to be seized. In the light of the very serious nature of the crime and the whole atmosphere as it must have appeared to him on a view of the totality of the attendant circumstances, we are not prepared on the present showing before us to say that his action was entirely unsupportable, or that it entailed any of the historic dangers so zealously and properly guarded against by the fourth amendment and its implementing decisions. See *State v. Macri, supra,* 39 *N. J.,* at *pp.* 255–258.

■ Although the warrant was obtained before any of the seizures, it appears to us that substantially all of those in question here were lawful without regard to it. It must be

borne in mind that when the search began on January 18, the tenancy of the defendant had already expired and the land-lord had acquiesced in and approved the conduct of the officers. Under these circumstances, the seizures of the shoes which were in open view, the shells which were stuffed in the chair, and the light switch plate and molding, were clearly supportable independently of the warrant. See *Maxwell v. Stephens,* 348 *F.* 2d 325, 337–338 (8 *Cir.*), *certiorari* denied 382 *U. S.* 944, 86 *S. Ct.* 387, 15 *L. Ed.* 2d 353 (Dec. 7, 1965); *Eisentrager v. State,* 79 *Nev.* 38, 378 *P.* 2d 526, 528–530 (1963); *People v. Van Eyk,* 56 *Cal.* 2d 471, 15 *Cal. Rptr.* 150, 154, 364 *P.* 2d 326, 330 (1961), *certiorari* denied, 369 *U. S.* 824, 82 *S. Ct.* 838, 7 *L. Ed.* 2d 788 (1962); *cf. Fredricksen v. United States,* 105 *U. S. App. D. C.* 262, 266 *F.* 2d 463, 464 (*D. C. Cir.* 1959); *Woodard v. United States,* 102 *U. S. App. D. C.* 393, 254 *F.* 2d 312, 313 (*D. C. Cir.*), *certiorari* denied 357 *U. S.* 930, 78 *S. Ct.* 1375, 2 *L. Ed.* 2d 1372 (1958); *Calhoun v. United States,* 172 *F.* 2d 457, 458 (5 *Cir.*), *certiorari* denied 337 *U. S.* 938, 69 *S. Ct.* 1513, 93 *L. Ed.* 1743 (1949); *People v. Kortwright,* 236 *N. Y. S.* 2d 385, 388–389 (*Sup. Ct.* 1962); Note, "Effective Consent to Search and Seizure," 113 *U. Pa. L. Rev.* 260, 272–277 (1964); *cf. Abel v. United States,* 362 *U. S.* 217, 241, 80 *S. Ct.* 683, 4 *L. Ed.* 2d 668, 687 (1960); *Friedman v. United States,* 347 *F.* 2d 697, 704–706 (8 *Cir.* 1965); *Feguer v. United States,* 302 *F.* 2d 214, 249 (8 *Cir.*), *certiorari* denied 371 *U. S.* 872, 83 *S. Ct.* 123, 9 *L. Ed.* 2d 110 (1962); *Burton v. United States,* 272 *F.* 2d 473, 476–477 (9 *Cir.* 1959), *certiorari* denied 362 *U. S.* 951, 80 *S. Ct.* 863, 4 *L. Ed.* 2d 869 (1960).

The Constitution does not prohibit all searches but only unreasonable ones; and whether a particular search is unreasonable will turn on the particular facts presented. *Ker v. State of California, supra,* 374 *U. S.,* at *p.* 33, 83 *S. Ct.,* at *p.* 1623, 10 *L. Ed.* 2d, at *p.* 737; *Davis v. United States,* 327 *F.* 2d 301, 306 (9 *Cir.* 1964); *State v. Coolidge,* 106 *N. H.* 186, 208 *A.* 2d 322, 328 (1965). Surely there was nothing unreasonable

in entering the room with the landlord's consent after the tenancy had expired (*People v. Van Eyk, supra,* 364 *P. 2d,* at 330), in taking the shoes which were in open view and the three shells which were stuffed in the chair (*Fredricksen v. United States, supra,* 266 *F. 2d,* at p. 464; *Calhoun v. United States, supra,* 172 *F. 2d,* at p. 458; *Ellison v. United States, supra,* 206 *F. 2d,* at p. 478), and in taking the light switch plate and the molding which were at all times the property of the landlord. Indeed it would seem that the only activity which would perhaps be questionable without the authority of the warrant, was the opening of the defendant's luggage and the taking of some of its contents. See *Holzhey v. United States,* 223 *F. 2d* 823 (5 *Cir.* 1955); *cf. Maxwell v. Stephens, supra,* where the court, in sustaining the seizure of the defendant Maxwell's coat on the basis of a consent by the owner of the premises, said:

"Whatever force might otherwise lie in the facts that the coat was clothing personal to Maxwell (and thus presumably an 'effect' within the meaning of the Fourth Amendment), that it was not contraband or an article the possession of which is illegal, or an instrumentality or fruit of the crime, or capable of possible use to effect his escape, see *Harris v. United States,* 331 U. S. 145, 154, 67 S. Ct. 1098, 91 L. Ed. 1399 (1947); *United States v. Lefkowitz,* 285 U. S. 452, 463–466, 52 S. Ct. 420, 76 L. Ed. 877 (1932); *Agnello v. United States,* 269 U. S. 20, 30, 46 S. Ct. 4, 70 L. Ed. 145 (1925); *Honig v. United States, supra, pp.* 919–920 of 208 F. 2d, this argument overlooks the consent of the officers' acquisition of the coat by a person having the proprietary interest in the premises where it was. If there was a search here at all, it was not a general search and certainly it was not a search violative of a locked container or the like. *Roberts v. United States, supra, p.* 898 of 332 F. 2d. Compare *United States v. Blok,* 88 U. S. App. D. C. 326, 328, 188 F. 2d 1019, 1021 (1951); *Holzhey v. United States, supra, p.* 826 of 223 F. 2d. It was an item which freely came into the hands of the authorities by one who had the right to make it available to them." 348 *F. 2d,* at *pp.* 337–338.

*Maxwell v. Stephens, supra,* also rejected a contention that the seizure of the coat and references to it at the trial, improperly compelled the defendant to be a witness against himself within the meaning of the fifth and fourteenth amendments. 348 *F. 2d,* at *p.* 338. Its determination in this regard conformed to the holdings in our own State and else-

where which confine the privilege against self-incrimination to examinations which are "testimonial" rather than "nontestimonial" in character. See *State v. Blair,* 45 *N. J.* 43, 44–45 (1965); *State v. King,* 44 *N. J.* 346, 357–358 (1965); *People v. Fuller,* 46 *Cal. Rptr.* 435, 438–439 (*D. Ct. App.* 1965); 8 *Wigmore, Evidence* §2265, n. 7 (*McNaughton Rev.* 1961).

Finally, the defendant complains about the seizure of the clothing he was wearing when arrested. It was taken from him sometime after he was received at the Hunterdon County jail and was later delivered to the trooper. The taking of the clothing and the examination of the trousers for bloodstains were clearly proper police procedures and were neither unreasonable nor violative of any of the defendant's constitutional rights. See *Robinson v. United States,* 109 *U. S. App. D. C.* 22, 283 *F. 2d* 508, 509 (*D. C. Cir.*), *certiorari* denied 364 *U. S.* 919, 81 *S. Ct.* 282, 5 *L. Ed. 2d* 259 (1960); *Charles v. United States,* 278 *F. 2d* 386, 388–389 (9 *Cir.*), *certiorari* denied 364 *U. S.* 831, 81 *S. Ct.* 46, 5 *L. Ed. 2d* 59 (1960); *Maxwell v. Stephens,* 229 *F. Supp.* 205, 209 (*E. D. Ark.* 1964), aff'd 348 *F. 2d* 325 (8 *Cir.*), *certiorari* denied 382 *U. S.* 944, 86 *S. Ct.* 387, 15 *L. Ed. 2d* 353 (Dec. 7, 1965); *State v. Post,* 255 *Iowa* 573, 123 *N. W. 2d* 11, 17 (1963); *State v. Menard,* 331 *S. W. 2d* 521 (*Mo.* 1960). In *Robinson v. United States, supra,* the defendants-appellants were convicted of housebreaking and grand larceny. On appeal, they challenged the legality of their arrest and the search and seizure which followed. The court, after finding that there was probable cause for arrest, said:

"Appellants Robinson and Williams complain that their clothing was removed at police headquarters, shortly after their arrest, and was subjected to tests at the laboratories of the Federal Bureau of Investigation. These tests revealed paint chips and other debris corresponding to like materials found at the scene of the burglary, and at a place where a safe stolen from the pharmacy had been opened. We think that this procedure was proper, since probable cause to believe appellants guilty of housebreaking and larceny had already appeared, and appellants were validly under arrest therefor. See, *e. g., Weeks v.*

*United States*, 1914, 232 U. S. 383, 392, 34 S. Ct. 341, 58 L. Ed. 652; *Morton v. United States*, 79 U. S. App. D. C. 329, 147 F. 2d 28, *certiorari* denied 1945, 324 U. S. 875, 65 S. Ct. 1015, 89 L. Ed. 1428; *Shettel v. United States*, 1940, 72 App. D. C. 250, 113 F. 2d 34." 283 *F. 2d*, at *p.* 509.

See also *State v. Papitsas,* 80 *N. J. Super.* 420 (*App. Div.* 1963).

Although the record before us does not disclose the precise hour when the clothing was taken from the defendant here, we assume that the elapsed time between his arrest and the taking of his clothing at the jail was longer than in *Robinson v. United States, supra.* However, we fail to find any legal significance in that circumstance. As the facts before us well illustrate, it would make no sense to insist that a defendant's clothes be removed immediately at the time of his arrest though facilities are not available, rather than after his delivery to jail where facilities are available. If we are to view the matter in terms of reasonableness and practicability, as everyone seems to concede, the removal here of the defendant's clothing at the Hunterdon County jail for examination was clearly lawful. Nothing in *Preston v. United States, supra,* suggests an intent to carry over an inflexible requirement of contemporaneity to this readily distinguishable type of situation involving internal prison routine and supervision. *Cf. People v. Shaw,* 46 *Cal. Rptr.* 217, 231 (*D. Ct. App.* 1965).

In *State v. Bisaccia,* 45 *N. J.* 504 (1965), this Court recently held that reasonable search, whether it be incidental to an arrest or under the authority of a search warrant, may be made not only for fruits and instrumentalities but also for evidence of the crime, at least where the evidence consists of tangibles other than private papers and documents; and more recently in *State v. Fioravanti, supra,* 46 *N. J.* 109, search and seizure incidental to an arrest were sustained in an opinion which laid great stress on the reasonableness of the official action and the common sense of the situation. Here, as well, we may stress the appropriateness of the conduct of the officers and the sensibleness of upholding it in the light of the

entire picture as it fairly appeared to them and as it has been presented to us. While at the premises they conducted their investigation and interrogation with decent regard for the rights of the individual as well as the needs of effective law enforcement, they entered the defendant's room only on his express invitation, they made casual observations without any infringement of his privacy and made their arrest on the basis of probable cause, and they made their search and seizures after having obtained a search warrant. While, as we have indicated, a more complete affidavit in support of the application for search warrant might well have been submitted, we are not disposed to set the warrant aside on the present showing before us; in any event, the seizures in the room of the shoes, the three shells and the light switch plate and molding, along with the seizure of the trousers at the jail, are clearly supportable in law apart from the warrant. We are satisfied that the County Judge did not err in denying the motion to suppress and his action is accordingly:

Affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For reversal*—None.