# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3550-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

BLAKE A. PUPO,
a/k/a BLAKE A. POPO,

     Defendant-Appellant.

_____

> Argued May 31, 2022 – Decided July 6, 2022
>
> Before Judges Rothstadt, Mayer and Natali.
>
> On appeal from the Superior Court of New Jersey, Law Division, Sussex County, Indictment No. 18-05-0161.
>
> Stephen W. Kirsch, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stephen W. Kirsch, on the brief).
>
> Shaina Brenner, Assistant Prosecutor, argued the cause for respondent (Francis A. Koch, Sussex County Prosecutor, attorney; Shaina Brenner, of counsel and on the brief).

PER CURIAM

After the trial court denied his motions to suppress, a jury convicted defendant Blake A. Pupo of two counts of first-degree distribution of a controlled dangerous substance (CDS), lysergic acid diethylamide (LSD), N.J.S.A. 2C:35-5(a)(1)(b)(6), one count of second-degree conspiracy to distribute LSD, N.J.S.A. 2C:5-2, and one count of fourth-degree possession of marijuana, N.J.S.A. 2C:35-10(a)(3). The same court also denied defendant's motion for a new trial and, after merger, sentenced him to an aggregate fifteen-year prison term with a six-year period of parole ineligibility and assessed applicable fines and penalties.

In addition to challenging the court's decision to deny his suppression and new trial applications, defendant argues the court erred when it prevented him from introducing the prior consistent statement of his former co-defendant, Kevin Dilks, and in failing to properly instruct the jury regarding the prosecutor's improper comments during closing argument. Finally, he argues we should vacate his conviction for marijuana possession.

Defendant specifically contends:

POINT I

THE MOTION TO SUPPRESS EVIDENCE SHOULD HAVE BEEN GRANTED FOR TWO REASONS: (1) THE WARRANT TO SEARCH DEFENDANT'S HOUSE AND CAR WAS UNSUPPORTED BY

2

PROBABLE CAUSE, AND (2) THE STOP AND ARREST OF DEFENDANT WERE UNSUPPORTED BY REASONABLE SUSPICION AND PROBABLE CAUSE, RESPECTIVELY.

POINT II

THE JUDGE COMMITTED REVERSIBLE ERROR UNDER N.J.R.E. 607 AND N.J.R.E. 803(a)(2) WHEN HE BARRED THE DEFENSE FROM ELICITING TESTIMONY REGARDING A PRIOR CONSISTENT STATEMENT BY KEVIN DILKS TO COUNTER A CHARGE OF RECENT FABRICATION BY THE STATE [,] THAT ERROR CUT TO THE CORE OF THE CREDIBILITY ISSUES IN THE TRIAL.

POINT III

THE PROSECUTOR WENT FAR OUTSIDE THE BOUNDS OF PROPRIETY WHEN, KNOWING FULL WELL THAT THERE HAD BEEN NO EVIDENTIARY PRESENTATION BY THE DEFENSE, HE TWICE ASKED THE JURY IN SUMMATION: "WHAT EVIDENCE HAS THE DEFENDANT OFFERED IN THIS CASE?" AND THEN, NOTING THAT ALL THE DEFENSE HAD IN ITS FAVOR WAS CROSS-EXAMINATION AND THE TRIAL TESTIMONY OF ONE STATE'S WITNESS, HE URGED THAT THE STATE'S EVIDENCE WAS SUPERIOR TO "WHAT [DEFENDANT]'S OFFERED."

POINT IV

THE DEFENDANT'S CONVICTION FOR POSSESSION OF MARIJUANA SHOULD BE REVERSED AND THAT COUNT DISMISSED UNDER THE NEW MARIJUANA REFORM LAW.

After reviewing the record in light of these contentions and the applicable law, we affirm defendant's first- and second-degree convictions, but vacate his fourth-degree marijuana conviction and remand the matter for the court to issue an amended and conforming judgment of conviction (JOC).

I.

We glean the following facts from the record developed during the suppression hearing and trial. In February 2018, Detective David Kraus of the Hopatcong Borough Police Department and the Sussex County Narcotics Task Force received information from a confidential informant that co-defendant Kevin Dilks was actively involved in the distribution of LSD to Drug Court participants at the Sussex County Courthouse. The police were aware that Dilks had previously been arrested for distribution of drugs and was himself participating in Drug Court probation and began surveilling him.

On February 21, 2018, Detective Kraus and other officers, including Detective Aldo Leone of the Sussex County Prosecutor's Office, followed Dilks from his residence at 217 Windsor Avenue in Hopatcong to the courthouse. When Dilks emerged, they observed as someone drove him to a Dunkin' Donuts on Route 206 in Newton where he was seen texting, and exiting the vehicle to make a phone call. A short time later, a gray Toyota Crossover D-HR pulled

into the parking lot and stopped near Dilks. Dilks walked over to the Toyota, placed his hand inside, into his pocket, and then back inside the car before walking away. The area was not known for drug trafficking, and police were unable to see anything actually transfer from the occupant of the Toyota and Dilks's hand, but they nevertheless believed they had just witnessed a drug transaction.

The police subsequently learned that the gray Toyota was registered to defendant's father. Based upon surveillance video later retrieved from the Dunkin' Donuts, they identified the driver of the car as defendant. Police subsequently spotted defendant with Dilks outside the courthouse on February 28, 2018.

On March 5, 2018, the police arrested Richard Clark, who was also a Drug Court participant, for first-degree distribution of LSD. Clark identified Dilks as his supplier and agreed to serve as a cooperating witness. He advised police that he typically planned his drug purchases with Dilks via text message by first handing over money to him and later picking up the LSD, which came in liquid form in small plastic vials. Clark explained that Dilks did not have the LSD in his possession, but had access to the drug from another unidentified individual.

A-3550-19

That same day, police directed Clark to make a controlled buy of one vial of LSD from Dilks for $375. Clark confirmed the deal with Dilks by text, took screen shots of the messages he exchanged with him, and sent them to the police. The police put a body wire on Clark and provided him with $375 in marked and previously photographed currency.

Clark drove to Dilks's house, and they subsequently went for a fifteen-minute car ride. The police followed and listened to the conversation inside the car where Clark gave Dilks the $375 and Dilks told him that the LSD would be available the following day.

On March 6, 2018, Dilks informed Clark by text that he could pick up the LSD later that day and that he would leave it in the mailbox at 122 Bell Avenue in Hopatcong, his girlfriend's home. The police set up surveillance at this address and also followed Clark by car to the location.

At 7:40 p.m. that night, police watched as defendant's vehicle stopped in front of 122 Bell Avenue. The police observed Dilks exiting the house, and briefly stopping by the car for "probably a minute, maybe less." Police wrote down the license plate of the vehicle before it departed. Dilks then immediately walked briefly to the side of the house, out of the sightline of the police. He then reappeared and was seen placing something in the mailbox bearing the

6

number 122, using the flashlight feature on his phone for guidance. Dilks walked back inside the home and a moment later police spotted Dilks "constantly walking by the front window," and appearing to be texting on his cell phone. Clark informed police that Dilks had just texted him and told him to come by to pick up the LSD.

At approximately 8:30 p.m., police watched as Clark pulled up in front of 122 Bell Avenue and retrieved something from the mailbox. Dilks was standing by the window at the time and gave Clark a "thumbs up." Later, Clark gave police a vial of suspected LSD that he had picked up from the mailbox.

Less than a week later, on March 12, 2018, police arranged for Clark to buy more LSD from Dilks. Clark again reached out to Dilks by text and arranged to purchase half a vial of LSD for $190, which was all Dilks stated he had available. Police gave Clark $190 in marked bills and again affixed a body wire on him.

At approximately 5:00 p.m., officers followed Clark to Dilks's home, where additional surveillance was in place, and listened in on Clark's body wire. After Dilks got into Clark's car, Clark gave him $190, and Dilks said that he should have the LSD later that night because his "boy" worked until 8:00 p.m.

A-3550-19

Clark and Dilks therefore planned to meet at 9:00 p.m. that evening for Clark to pick up the LSD.

Meanwhile, Detective Leone and other officers had been conducting surveillance on defendant. They watched as defendant drove from his father's medical office and parked in the driveway to his home in Fredon. At 9:00 p.m., additional officers who were conducting surveillance of defendant in Hopatcong spotted defendant's car near Dilks's residence. Dilks, who had been pacing in the driveway, walked over to the passenger side window, and reached in. Defendant then departed.

Clark thereafter advised police that Dilks had obtained the LSD from his contact. They followed Clark to Dilks's residence. At approximately 11:15 p.m., Clark stopped in front of the residence and Dilks was standing at the end of the driveway. Dilks walked over to Clark's car, opened the passenger door slightly and "tossed" the LSD into the car without speaking. Clark subsequently provided police with a cigarette box containing a vial of LSD that he had obtained from Dilks.

Meanwhile, other officers followed defendant and ultimately pulled him over in Andover and arrested him. According to Detective Leone, after

defendant was <u>Mirandized</u>,[1] he admitted that he sold LSD to Dilks on March 6th and 12th, and the $170 in a cupholder inside the car was the proceeds from the last transaction. Police also arrested Dilks later that night.

At 10:30 p.m., after defendant's arrest, but before Clark picked up the LSD from Dilks, Detective Leone telephoned a judge to apply for a search warrant for defendant's house and car. Leone informed the judge that defendant had seven prior felony convictions, had violated probation more than once and was presently in Drug Court probation for second-degree CDS distribution. He noted that a confidential informant had identified Dilks as a drug dealer and that he had observed brief meetings between Dilks and defendant in front of Dunkin' Donuts and at the courthouse. He conceded, though, that he had not directly observed a hand-to-hand transaction on either date.

Leone described the police surveillance of Dilks and defendant in connection with the controlled buys made by Clark. He again conceded that he had not seen the actual transactions between defendant and Dilks. Lastly, Leone informed the court that, after his arrest, defendant admitted picking up money from Dilks in exchange for dropping off LSD on both March 6 and 12, 2018.

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

A-3550-19

Based upon the foregoing, the motion judge found that there was probable cause for the issuance of the requested search warrant.

The police later executed the search warrants and while searching defendant's bedroom seized a: (1) backpack containing a heat sealed bag containing four ounces of marijuana and a scale; (2) second scale in a dresser drawer; (3) Ziploc heat sealer and two glass vials with dropper tops, one of which appeared to contain LSD residue; (4) six bait cartridges[2] in a dresser drawer; (5) box addressed to defendant containing four glass vials with medicine dropper tops in the closet; and (6) an "ice drops" container from defendant's bedframe.

Other officers searched defendant's car and retrieved: (1) $170 from the center console cup holder; (2) two Samsung Galaxy cell phones; (3) a Samsung Tablet; (4) a wallet containing defendant's credit cards; (5) a bank statement for defendant; (6) a spiral notebook; and (6) a backpack on the front seat that contained a spiral notebook, two phones and a tablet. One side of the notebook contained the word "wax," which the police described at trial as a hard substance

---

[2] Although the transcript refers to "bait cartridges," we note that the record elsewhere indicates defendant sold preloaded "vape cartridges" to Dilks, and we presume the reference to "bait cartridges" is a transcription error. The distinction, however, has no effect on our analysis.

containing THC oil, with several names written underneath. On the other side of the notebook was the letter "L" with several names and initials underneath. One set of initials was "KD".

Police also searched Dilks's house and recovered: (1) a $20 bill attached to Dilks's wallet (one of the marked bills); and (2) two cell phones – a Samsung Galaxy and a black LG with a cracked screen. They did not find any drugs.

Defendant later moved to suppress his incriminating statements and the physical evidence seized from his car and bedroom. He argued that police lacked probable cause or reasonable suspicion to stop and immediately arrest him in Andover, and in addition, that he did not receive <u>Miranda</u> warnings at the scene of his arrest. Further, he contended that the police lacked probable cause to support the search warrants for his home and his car.

At the suppression hearing, defendant testified, as did Detective Leone. Detective Leone described the investigation, including all surveillance and the two controlled buys, conceded that the police were unable to actually see any hand-to-hand exchanges between defendant and Dilks, and related the statements made by defendant at the time of his arrest. For his part, defendant denied receiving complete Miranda warnings.

Defense counsel again argued there was no probable cause as to the search warrant for defendant's house and car, and further, that defendant's stop and arrest were not supported by reasonable suspicion or probable cause.

In a written opinion dated December 17, 2018, the motion judge concluded that defendant's incriminating statements to police at the time of his arrest were inadmissible because defendant was subject to custodial interrogation, and there was "no evidence to support a finding" that defendant received the appropriate Miranda warnings. The court denied defendant's application to suppress the physical evidence seized by the police, however, after concluding that there was probable cause for the issuance of the search warrant, even after the court excised defendant's inculpatory statements.

The motion judge based his conclusion upon: (1) Clark's controlled purchases of LSD from Dilks; (2) the "extensive observation" of drug-related interactions between defendant and Dilks at Dilks's residence, Dunkin' Donuts and the courthouse; and (3) the detailed accounts of the police surveillance on March 6 and 12 which included law enforcement observation of defendant "dropping off drugs in Dilks's mailbox or to Dilks in Hopatcong in exchange for cash."

Defendant later moved before a different judge for reconsideration contending Detective Leone's testimony in support of the March 12, 2018 search warrant was insufficient to establish probable cause, given the suppression of defendant's statements. Specifically, defendant argued that because the suppression hearing resulted in exclusion of defendant's statement, the court should reconsider the evidence in support of the search warrant, as the alleged drug transactions were not suggestive of criminal activity. Counsel emphasized the limitations in what the police actually observed and insisted that the motion judge erred in relying upon mere assumptions in finding that there was a history of actual narcotics transactions in front of the courthouse, at the Dunkin' Donuts, and in connection with the controlled buys.

The reconsideration judge denied defendant's motion despite acknowledging that defendant never sold drugs to Clark directly, and that the police were never in a position to see exactly what, if anything, was transferred between defendant and Dilks. In so ruling, the judge explained that: (1) it was not uncommon for drug transactions to have "several layers of insulation" such that there was a disassociation between the payment of money and the transfer of drugs; (2) the court must look at these situations with an "educated eye" in order to make a judgment "consistent with reality"; and (3) the information

13

supplied by the confidential informant, the police surveillance of defendant and Dilks, and the information collected in connection with the controlled buys, all supported the conclusion that defendant was involved in illegal narcotics transactions.

As the reconsideration judge stated, "[t]he choreography of these events is such that I think it would be foolish to not understand that what we're seeing is characteristic of, indicative of, typical of, distinctive of, narcotics transaction[s]." In the judge's view, the series of events, viewed as a whole, could not realistically be portrayed as mere coincidence.

Dilks thereafter pled guilty to first-degree distribution of LSD on July 31, 2018. We discern from the portion of the transcript read into the record at trial that Dilks inculpated defendant as his supplier in his plea.

At trial, Clark testified to his participation in the two controlled buys. He confirmed that Dilks had been his regular supplier, but that he never knew from whom Dilks obtained the drugs.

Detective Thomas Laird of the Sussex County Prosecutor's Office testified that he performed a forensic examination on the LG phone found in Dilks's bedroom. He extracted information from the phone, including one contact listed as "Dick" with Clark's phone number, and another listed as "Poo" with

defendant's phone number. Detective Laird also introduced text conversations between defendant and Dilks, and Dilks and Clark, that the State uncovered as part of its investigation. Prior to both controlled buys, the text messages revealed Dilks had contacted defendant to purchase the LSD that would ultimately be sold to Clark, see infra, at pp. 33-34.

Dilks testified that he sold LSD to Clark on at least two occasions. Dilks also testified that, contrary to his sworn testimony at the time of his guilty plea, he obtained the LSD from an unidentified individual in Jersey City, not defendant. He suggested that he had inculpated defendant at his plea hearing only because the prosecutor threatened "to take [thirty] years of [his] life away if he didn't hear what he wanted to hear." Dilks further implied that the transactions involved borrowing money from defendant because Dilks worked seasonally and owed child support and fines, and that he would pay defendant back in installments.

Given Dilks's hostility during the prosecutor's direct examination, the prosecutor did not, at the trial court's suggestion, confront Dilks directly with his sworn testimony at his July 31, 2018 plea hearing. Rather, a few days later, the prosecutor read into the record Dilks's testimony from that hearing wherein he identified defendant as his supplier. Specifically, Dilks stated Clark

contacted him on March 12, 2018, and asked for LSD. Dilks further testified that he later met with defendant at his car window, defendant gave him the drugs, and he gave defendant $170 of the $190 the money from Clark. The extra $20 he kept was later found by police in his house.

In light of the prosecutor's introduction of Dilks's prior statement, defense counsel sought to rebut the inference that Dilks had fabricated his trial testimony by presenting a prior statement made by Dilks to his lawyer Charles O'Connell, Esq., during plea negotiations, that was consistent with his trial testimony. Specifically, defense counsel sought to either: (1) call O'Connell to testify that during plea negotiations Dilks told him that he got the drugs in Jersey City; or (2) present to the jury a July 30, 2018, transcript of the plea negotiations where O'Connell relayed this statement to the court.

The prosecutor objected to defense counsel's request, explaining that Dilks was no longer on the stand, no one was sworn in on July 30, 2018, and Dilks did not directly inform the court of his supposed Jersey City supplier. The trial court was troubled by the fact that what defense counsel sought to admit was O'Connell's statement and not Dilks's. The court also noted that, while Dilks had implicated defendant unwillingly at the time of his plea, he had not necessarily been untruthful.

At a hearing outside the presence of the jury, O'Connell testified that: (1) he represented Dilks at his plea hearing; (2) Dilks was adamant he did not want to testify against defendant; (3) Dilks told him he got the LSD from someone in Jersey City; (4) O'Connell stated on the record that on July 30, 2018 Dilks had told him he received the LSD from a Jersey City source; (5) the prosecutor stated that the only way Dilks's plea deal would going through was if Dilks identified defendant as his supplier in testifying regarding the factual basis for his plea; and (6) the next day, July 31, 2018, Dilks agreed to implicate defendant.

The trial judge denied defendant's request, finding that: (1) the prior consistent statement sought to be admitted was defense counsel's, not Dilks's; (2) the statement was not made while under oath and was not reliable; (3) it was "unusual" to have an attorney testify about conversations with his client in the course of plea negotiations and attribute to them evidential value; (4) Dilks's subsequent sworn plea testimony overrode any earlier statements; and (5) in any event, O'Connell's testimony was unnecessary as Dilks had been very emphatic in his testimony that defendant was not his drug supplier.

After defendant's counsel informed the court that defendant would not be testifying and that the defense rested, the trial court reminded the jury as follows:

Yes, and as you recall, ladies and gentlemen, our jurisprudence is a defendant has an absolute right not to testify and the State has the burden of proof and not the defense so there is no obligation on them to do anything.

They have, of course, raised or done cross-examination and have introduced items into evidence, but that . . . brings an end to the presentation of the evidence.

During his summation, defense counsel stressed effectiveness of his cross-examination in this case, emphasizing that it had exposed the following weaknesses in the State's case: (1) numerous reporting errors made by the police; (2) flaws in the surveillance conducted by the police; (3) allegedly improbable testimony; (4) Clark's self-interest in this matter and his unfamiliarity with defendant; and (5) the State's alleged manipulation of the phone evidence. Counsel emphasized that although the burden of proof was on the State, it had not produced any direct evidence of defendant's guilt, relying instead on Dilks, its "star witness," to support its circumstantial case.

Defendant's counsel continued that Dilks had unexpectedly, in a dramatic "Perry Mason moment," testified that defendant was not his drug supplier and that his prior statement to the contrary was the result of coercion by the prosecutor. Counsel concluded his remarks by asserting that the case came

18

down to the State's burden of proof, circumstantial evidence, reasonable doubt, the presumption of innocence, and defendant's right to remain silent.

In response, during his summation, the prosecutor first acknowledged that the State bore the burden of proof in this case and then outlined all of the proofs submitted by the State. As he concluded his remarks, the prosecutor stated:

> So who is really selling the LSD here? Is Kevin Dilks the source or is [defendant] the source? All of the evidence shows that [defendant] is the source here, all of the evidence including most critically, the phone records.
>
> So, all of that evidence, they're seen together, [defendant's] vehicle, the buy money, $170 of buy money found in this car, the buy money, photocopies of it, found in [defendant]'s car that night.
>
> Was this money that Kevin Dilks just owed him for something or was this money for LSD? It was money for LSD. This ledger. Wax. L, K.D., the check mark next to it found in Blake Pupo's car that night right on the front seat right next to him.
>
> This is the record of the drug activity. Drug distribution. <u>What evidence has the defendant offered in this case? What evidence has the defendant offered?</u>
>
> <u>He's offered argument about cross-examination and he's offered Kevin Dilks's testimony. That's what he's offered.</u> This is what the State has offered. I would submit to you the evidence is clear. The evidence corroborates itself.
>
> [emphasis supplied].

After the prosecutor concluded his remarks, defense counsel advised the court that he had "some issues with the closing" and wished to make an application. As it was the end of the day, the trial court elected to excuse the jury before addressing counsel's motion. Defense counsel then moved for a mistrial alleging that the prosecutor had improperly shifted the burden of proof to the defense in the statements emphasized above. The trial court said that it had not "pick[ed] it up in the same way," and that it needed to listen to the recording before making a ruling.

The next day, the trial court denied defense counsel's motion without prejudice. It found that, while less than "ideal and perhaps better left unsaid," the challenged remarks were not egregious and did not warrant a mistrial. It noted that it had not "registered" the remarks as objectionable when they were made, and that it was satisfied that the situation could be easily remedied with curative instruction. Although defense counsel argued that a curative instruction should have been administered the night before and would now be ineffective, the court believed that it had acted within its discretion in releasing the jury prior to the resolution of counsel's motion. It noted that defense counsel had raised his objection at 4:15 p.m., fifteen minutes after the jury was usually discharged, and that it had anticipated that the motion would take at least twenty minutes to

20

resolve. The prosecutor agreed to permit the court to inform the jury to strike his statements.

Instead of striking the statements, the court gave a lengthy curative instruction wherein it advised the jury that the prosecutor may have made "some statements" in his summation which "might have had a tendency to . . . shift the burden of proof to defendant." It then repeatedly reinstructed the jury that the State bore the burden of proof and that the defense was not obliged to present any evidence at trial. It stated that, while the defense had presented physical and testimonial evidence, the burden of proof remained with the State.

Further, in its final charge to the jury, the court reiterated that the State bore the burden of proof and that defendant had the right to remain silent. After the jury began deliberations, the trial court revisited defense counsel's application, but ultimately maintained its initial ruling that the prosecutor's statements did not warrant the granting of a mistrial.

After he was convicted, defendant filed an application for a new trial, arguing, among other grounds, that the State's comments in summation improperly shifted the burden of proof and therefore deprived defendant of a fair trial. Specifically, defendant maintained the remarks should have been withdrawn and stricken from the record, and asserted that the curative

instruction administered by the court the next morning was untimely and ineffective because it was merely a "general instruction on burden of proof and the right to remain silent."

The court denied defendant's motion, again noting that the at-issue remarks "had not jumped out at him," that it had taken time to resolve counsel's objection and that it would not have been appropriate to make the jury wait indefinitely. The court explained:

> In terms of what was said, I would characterize it as something that is not ideal and perhaps could have been argued differently or left out completely, but not quite as – the [d]efense argued it was an intentional attempt to shift in the jury's thinking and feeling; the burden of proof. I don't think it was that either . . . .
>
> And I would say that if it had to be done again it would be rephrased or unsaid, but we deal with what has been done . . . .
>
> . . . .
>
> Anyway, the statement was, what evidence has the defense offered? And then, he's offered argument and the testimony of Dilks. So the reason it's not ideal is because whenever we say anything about – or the State says anything about what the [d]efendant has done or not done, we run into the principle and run, perhaps, contrary to the principle that a defendant has no obligation to do anything; produce any evidence or witnesses, or for that matter, argument.

The reason why I think it is not . . . and it didn't strike my ear as clearly contrary to our jurisprudence or . . . an unambiguous reference to the failure of the [d]efendant to produce testimony or evidence is because, number 1, there was some evidence produced by the [d]efense. Exhibits and things of that nature. Number two, the State in its argument referred to – I think what it was thinking about, and that is the [d]efense arguments based on cross-examination or testimony generally regarding the State's case and the testimony of Dilks. My longwinded point being that it wasn't by its terms a statement that the [d]efense has done nothing. It was a statement that what they had done is limited in terms of countering the – what I would say the direct proofs of the State.

And, again, I may be confusing the issue as I go through it to a certain extent, but the [d]efense is entitled to offer argument. Is entitled to point to the testimony of Dilks and other testimony. And so, it sounded to me like a – perhaps inartful way of contrasting the evidence that supported the [d]efense theory with the evidence that the State felt supported its theory.

The court entered a conforming order denying the application, and after amending the JOC to correct certain errors related to fines and penalties, this appeal followed.

II.

In defendant's first point, he argues that the court committed reversible error in admitting evidence retrieved from his car and home. He specifically contends the search warrants for his house and his car were not supported by

probable cause, and separately, the vehicle stop and arrest in Andover were not supported by reasonable suspicion or probable cause. We disagree with all of these arguments.

In evaluating a trial judge's ruling on a suppression motion, we afford considerable deference to the judge's role as a fact-finder. Our review of the judge's factual findings is "exceedingly narrow." State v. Locurto, 157 N.J. 463, 470 (1999). We must defer to those factual findings "so long as those findings are supported by sufficient evidence in the record." State v. Hubbard, 222 N.J. 249, 262 (2015) (internal citations omitted). For mixed questions of law and fact, we give "deference . . . to the supported factual findings of the trial court, but review de novo the lower court's application of any legal rules to such factual findings." State v. Pierre, 223 N.J. 560, 577 (2015) (internal citations omitted).

As part of that deference, we particularly must respect the trial judge's assessments of credibility, given the judge's ability to have made "observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." Locurto, 157 N.J. at 474. However, we owe no deference to the trial judge's conclusions of law. State v. Hinton, 216 N.J. 211, 228 (2013). Nor are we "obliged to defer to clearly mistaken findings . . .

that are not supported by sufficient credible evidence in the record." State v. Gibson, 218 N.J. 277, 294 (2014).

"A search that is executed pursuant to a warrant is 'presumptively valid,' and a defendant challenging the issuance of that warrant has the burden of proof to establish a lack of probable cause 'or that the search was otherwise unreasonable.'" State v. Boone, 232 N.J. 417, 427 (2017) (quoting State v. Watts, 223 N.J. 503, 513-14 (2015)). Probable cause is a "'common-sense, practical standard' dealing with 'probabilities' and the 'practical considerations of everyday life,'" and is generally understood to mean "'less than legal evidence necessary to convict though more than mere naked suspicion.'" State v. Evers, 175 N.J. 355, 381 (2003) (first quoting State v. Sullivan, 169 N.J. 204, 211 (2001); then quoting State v. Mark, 46 N.J. 262, 271 (1966)).

"Courts consider the 'totality of the circumstances' and should sustain the validity of a search only if the finding of probable cause relies on adequate facts." Boone, 232 N.J. at 427 (quoting State v. Jones, 179 N.J. 377, 388-89 (2004)). "[T]he probable cause determination must be . . . based on the information contained within the four corners of the supporting affidavit, as supplemented by sworn testimony before the issuing judge that is recorded

contemporaneously." Ibid. (alteration in original) (quoting State v. Marshall, 199 N.J. 602, 611 (2009)).

As noted, defendant renews his contentions raised before the court that both the initial motion judge and the reconsideration judge made findings that defendant engaged in drug transactions that were without actual factual support given the limitations in what the police were able to observe. We are satisfied that the reconsideration judge's assessment of the matter was entirely accurate, and that the vehicle stop and defendant's immediate arrest were lawful.

We review defendant's arrest from an objective standpoint, State v. O'Neal, 190 N.J. 601, 613-14 (2007), and consider the proofs known to police at the time they stopped defendant's vehicle, which does not include the text messages from defendant to Dilks that were introduced at trial. We also do not consider the suppressed statements defendant made to police shortly after his arrest, and note that both the first and second motion judges also excluded these statements from their analyses.

Generally, police encounters with individuals occur at three distinct levels: a field inquiry; an investigatory stop; or an arrest. State v. Nishina, 175 N.J. 502, 510-11 (2003). There are constitutional considerations at all levels of encounters. Ibid. A field inquiry is "the least intrusive encounter," which occurs

when a police officer approaches a person and asks if he or she is willing to answer some questions. State v. Pineiro, 181 N.J. 13, 20 (2004). An investigatory stop, often referred to as a Terry[3] stop-and-frisk, may be "based on the totality of the circumstances, [where] the officer ha[s] a reasonable and particularized suspicion to believe that an individual has just engaged in, or was about to engage in, criminal activity." State v. Stovall, 170 N.J. 346, 356 (2002). An arrest requires probable cause, which is defined as a "well-grounded suspicion or belief on the part of the searching or arresting officer that a crime has been or is being committed." State v. Guerrero, 232 N.J. Super. 507, 511 (App. Div. 1989).

Based upon these principles, we are satisfied police had sufficient probable cause to arrest defendant, and therefore to effectuate the vehicle stop in Andover.[4] See O'Neal, 190 N.J. at 611-12 ("The standard for a Terry stop 'is lower than the standard of probable cause necessary to justify an arrest.'" (quoting Nishina, 175 N.J. at 511)). As detailed, prior to the stop, police

---

[3] Terry v. Ohio, 392 U.S. 1, 20 (1968).

[4] We acknowledge that the court did not specifically address the propriety of the vehicle stop, instead primarily addressing the constitutionality of the warrants issued by the court.

conducted an extensive investigation into the distribution of LSD to Drug Court participants, which ultimately implicated defendant as a supplier in that scheme.

We agree with the reconsideration judge that the various encounters between defendant and Dilks may not independently establish probable cause, but considered together, the totality of the circumstances established ample probable cause for a reasonable officer to believe defendant sold LSD to Dilks. See State v. Harris, 384 N.J. Super. 29, 47 (App. Div. 2006) ("Probable cause exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." (quoting Moore, 181 N.J. at 46)). Although police did not directly observe anything pass hand-to-hand on March 6th and March 12th, each time officers observed defendant interact with Dilks from his car, they shortly after observed Clark arrive to pick up the LSD from Dilks.

Further, to the extent the initial motion judge based his decision on the factual finding that defendant placed the drugs in the mailbox at 122 Bell Avenue, we acknowledge that such a finding was incorrect, as the record established only that defendant pulled into the driveway at 122 Bell Avenue to meet defendant on March 6, 2018. We do not defer to this "clearly mistaken

finding," <u>Gibson</u>, 218 N.J. at 294, but we disagree with defendant's characterization of the error as "catastrophic," as we are satisfied, as noted, there was sufficient probable cause to stop and arrest defendant even excluding the initial court's erroneous factual finding. We also note, in reaching this conclusion, that appeals are from orders, not opinions, <u>see</u> <u>Do-Wop Corp. v. City of Rahway</u>, 168 N.J. 191, 199 (2001).

In any event, the evidence in support of the warrant was reevaluated by the reconsideration judge, who came to the same conclusion. Indeed, that judge explicitly highlighted that defendant "never sold drugs to the cooperating witness directly," and acknowledged that "law enforcement was never in a position to see exactly what might have been transferred at different points."

We agree with the reconsideration judge's conclusion that the interactions between defendant and Dilks nonetheless fully supported a finding of probable cause. We are satisfied that the court's decision to deny defendant's motion to suppress was supported by "sufficient credible evidence in the record" and the legal principles were appropriately applied. <u>Hinton</u>, 216 N.J. at 228 (quoting <u>State v. Handy</u>, 206 N.J. 39, 44 (2011)).

29

## III.

In his second point, defendant argues, the court erred in excluding testimony from Dilks's plea counsel regarding a statement made to him by Dilks during plea negotiations, wherein Dilks stated that his drug supplier was someone in Jersey City, not defendant. We are not convinced that any error committed by the court supports reversal of defendant's conviction in light of the substantial circumstantial evidence supporting his guilt, and the jury's ability to evaluate Dilks's testimony.

A reviewing court will defer to a trial court's evidentiary ruling absent an abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021). It will not substitute its judgment unless the evidentiary ruling is "so wide of the mark" that it constitutes "a clear error in judgment." Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)). However, reversal of a conviction is only warranted when the mistaken evidentiary ruling has the "clear capacity to cause an unjust result." Ibid.

When a "declarant-witness testifies and is subject to cross-examination," N.J.R.E. 803(a)(2) permits the admission of previously-made statements of the declarant-witness that are "consistent with the declarant-witness' testimony and offered to rebut an express or implied charge against the declarant-witness of

recent fabrication or improper influence or motive." N.J.R.E. 607 provides that a prior consistent statement shall not be admitted to support credibility except "to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive and as otherwise provided by the law of evidence."

"The scope of the [N.J.R.E. 803(a)(2)] exception encompasses prior consistent statements made by the witness before the alleged 'improper influence or motive' to demonstrate that the witness did not change his or her story." Neno v. Clinton, 167 N.J. 573, 580 (2001) (emphasis added). We have observed, however, that our Supreme Court "declined to adopt as a rigid admissibility requirement that the prior statement was made prior to the motive or influence to lie." State v. Muhammad, 359 N.J. Super. 361, 386 (App. Div. 2003). There, we explained that "the purpose of N.J.R.E. 803(a)(2) is best advanced by not requiring a strict temporal requirement, but instead allowing judges to evaluate relevance under all of the circumstances in which the prior statement is proffered." Id. at 388. In reaching this conclusion, we acknowledged that "whether the statement was made before the asserted motive or influence to fabricate is a substantial factor in determining relevance." Ibid.

Accordingly, we have explained that "fabrication is 'recent' if it post-dates a prior consistent statement." State v. Moorer, 448 N.J. Super. 94, 110 (App. Div. 2016). In such a situation, "a consistent statement that predates the motive is a square rebuttal of the charge that the testimony was contrived as a consequence of that [improper] motive," and thus has clear probative value. Id. at 111 (quoting Tome v. U.S., 513 U.S. 150, 158 (1995)).

We initially observe that in denying defendant's request to introduce Dilks's prior consistent statement, it incorrectly relied upon N.J.R.E. 803(a)(1), the hearsay exception for prior inconsistent statements, rather than N.J.R.E. 803(a)(2). A prior inconsistent statement is only admissible if it is "contained in a sound recording or in a writing made or signed by the declarant-witness," or if it was given under oath. N.J.R.E. 803(a)(1). On the other hand, N.J.R.E. 803(a)(2), as discussed, requires only that the statement be "consistent with the declarant-witness' testimony and . . . offered to rebut an express or implied charge against the declarant-witness of (A) recent fabrication or (B) improper influence or motive." As noted, the court concluded the statement was inadmissible because it was not made under oath, and was a "statement made by [Dilks] to his attorney," to which O'Connell would testify. We agree with

defendant that this ruling was error, as defendant sought to admit Dilks's prior consistent statement under N.J.R.E. 803(a)(2), not N.J.R.E. 803(a)(1).

We also note that the court erred to the extent it based its decision on the fact that the statement was not made by Dilks himself. The very purpose of N.J.R.E. 803(a)(2) is to admit the declarant's prior consistent statement to rebut a charge of recent fabrication. We are not convinced that defendant's intent to do so through the vehicle of Dilks's attorney, O'Connell, was contrary to the Rule.

We conclude, however, that the preclusion of this statement was harmless error given the wealth of incriminating evidence presented at trial. For example, at trial, the State presented text messages exchanged between Clark and Dilks which set up the two money drop-offs and subsequent drug buys observed by police through coordinated surveillance, as well as text messages exchanged between Dilks and defendant which, through substance, timing and coordinated police surveillance, established defendant's role as supplier in this drug distribution scheme.

The earliest text messages from defendant to Dilks on March 1, 2018 read, "Hey Buddy, you want my last bottle? . . . I need the money today." When Dilks declined, defendant offered that he "should be able to get more whenever." On

33

March 5, 2018, text messages from Clark to Dilks read, "Yo, your boy going to be around this week?"  At about 3:00 p.m. that afternoon, Dilks texted defendant to ask if he "has one," and defendant responded that he had access to two bottles with "about 100 puffs" each on "preloaded cartridges."  Dilks requested one, and that same afternoon, at 3:30 p.m., Clark ordered one bottle for $375 from Dilks. The next day, text messages from defendant to Dilks revealed a plan for defendant to drive to Dilks's girlfriend's house at 122 Bell Avenue in Hopatcong to drop off the bottle.  Texts from that evening confirmed defendant drove to the address, and police observed as he pulled into the driveway and met with Dilks.

On March 12, 2018, Dilks requested another bottle from defendant, but defendant responded he could "definitely do half.  Have that at home."  Twenty minutes later, Dilks texted Clark informing him the supplier "only has half right now."  Clark confirmed the price of $190 for the half bottle, and the two planned to meet at 5:00 p.m. that evening for Clark to drop off the money.  Texts from defendant to Dilks at 5:18 p.m. read, "I'm supposed to work till 8:00, can probably meet around [nine] after I run home and grab the half."

At 8:38 p.m. that evening, Dilks texted defendant his address at 217 Windsor Avenue, and at 9:04 p.m., Dilks touched base with Clark saying, "Just talked to him.  Should be here around 9:30."  At 9:14 p.m., defendant texted

34

Dilks that he was a mile away from 217 Windsor Avenue, and Dilks confirmed he was outside waiting. Police again observed as defendant arrived to meet Dilks outside. At 9:19 p.m., Dilks texted Clark, "Ready when you are," and as noted, Clark arrived later that evening to pick up the LSD.

Given these exchanges, we are satisfied that there was ample circumstantial evidence that defendant supplied Dilks with the LSD sold to Clark, despite Dilks's recanted testimony to the contrary. That evidence also included the marked bills and ledger found in defendant's car, as well as the drugs and related paraphernalia found at his home. In addition, Dilks's claim that he purchased the drugs from someone in Jersey City was rebutted by the lack of communication on his phone with anyone in Jersey City. Nor were there proofs to support Dilks's claim that he gave money to defendant to repay a personal loan, given the unusual circumstances in which these "payments" were made. We also stress that the jury had an opportunity to evaluate Dilks's credibility. Accordingly, we reject defendant's contention that the trial court erred in excluding testimony from Dilks's plea counsel regarding Dilks's alleged prior consistent statement, as the exclusion of this evidence did not have the capacity to cause an unjust result given the extensive proofs against defendant.

A-3550-19

IV.

We turn next to defendant's contention that the court committed error in failing to grant a mistrial in response to the alleged misconduct of the prosecutor committed during his closing arguments when he purportedly shifted the burden of proof and implied defendant was responsible for presenting evidence in his defense when he remarked "[w]hat evidence has the defendant offered in this case." Defendant also maintains that the curative instruction administered by the court was ineffective because it was untimely and failed to identify the offending remark and direct that it be disregarded by the jury. We reject these arguments.

A motion for a mistrial should be granted only in those situations which would otherwise result in manifest injustice. State v. DiRienzo, 53 N.J. 360, 383 (1969). The decision to deny a motion for a mistrial is within the sound discretion of the trial court, and will only be reversed on appeal for abuse of this discretion. State v. Winter, 96 N.J. 640, 647 (1984).

Defendant's allegation of prosecutorial misconduct requires us to assess whether the defendant was deprived of the right to a fair trial. State v. Jackson, 211 N.J. 394, 407 (2012). To warrant reversal on appeal, the prosecutor's misconduct must be "clearly and unmistakably improper" and "so egregious"

that it deprived defendant of the "right to have a jury fairly evaluate the merits of his defense." State v. Wakefield, 190 N.J. 397, 435-38 (2007). When the alleged misconduct involves a particular remark, a reviewing court should consider whether: (1) defense counsel objected in a timely and proper fashion to the remark; (2) the remark was withdrawn promptly; and (3) the trial court gave the jury a curative instruction. State v. Smith, 212 N.J. 365, 403-04 (2012); State v. Zola, 112 N.J. 384, 426 (1988).

A prosecutor is expected to make a "vigorous and forceful" closing argument to the jury. State v. Lazo, 209 N.J. 9, 29 (2012) (quoting State v. Smith, 167 N.J. 158, 177 (2001)). A prosecutor may make remarks that constitute legitimate inferences from the facts, provided he or she does not go beyond the facts before the jury. State v. R.B., 183 N.J. 308, 330 (2005). A prosecutor may also respond to arguments raised by defense counsel during his or her own summation. State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001). A prosecutor, however, may not, through his or her remarks, shift the burden of proof to the defense, or draw attention to a defendant's failure to testify. State v. Loftin, 146 N.J. 295, 389 (1996); State v. Engel, 249 N.J. Super. 336, 382 (App. Div. 1991).

A-3550-19

When viewed in context, the prosecutor's remarks, although inartfully stated, were made in response to defense counsel's contention in summation that he had exposed the holes in the State's case with his cross-examination of the various witnesses and the testimony of Dilks. We are satisfied that the remarks did not fall into the category of "egregious" warranting a mistrial. Rather, the prosecutor essentially answered his own question by noting that the defense's case was built around cross-examination and Dilks's testimony.

We are further convinced that the prosecutor's remark did not have the impermissible burden shifting impact that defendant now ascribes to it on appeal. To the extent there was any impropriety, the comments were not of the sort to warrant the relief requested by defendant, particularly in light of the court's general and specific instructions, detailed supra at pp. 20-21, in which it emphasized the State's burden of proof. Those instructions were more than sufficient to address the issue raised by the prosecutor's comments. We also find no merit to defendant's claim that the court's instruction issued the next day rendered it anyway infective. We presume the jury followed the court's instructions. See State v. Wilder, 193 N.J. 398, 415 (2008) ("We credit juries for following instructions carefully and applying the facts, as found, to the law, as instructed.").

V.

Defendant contends in his final point that in accordance with N.J.S.A. 2C:35-23.1(b)(2), a remand is warranted for the court to vacate his conviction of fourth-degree possession of marijuana. The State has taken takes no position on defendant's argument.

Under N.J.S.A. 2C:35-23.1(b)(2), a court is authorized to vacate a defendant's conviction and sentence for fourth-degree possession of marijuana and other marijuana crimes. As that statutory provision explicitly authorizes the relief requested, and the State has offered no substantive opposition to the issue, we vacate defendant's conviction for possession of marijuana.

Affirmed in part and remanded for the court to issue an amended JOC vacating defendant's conviction for fourth-degree possession of marijuana and all related fines and penalties.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3550-19